## J. D. PORTER v. YODER & GORDON COMPANY, INC.

### (Filed 7 June, 1957.)

**1. Statutes § 5a—**

The intent and spirit of an act controls in its construction, and when the meaning of a statute is in doubt, reference may be had to the title and context as legislative declarations of its purpose.

**2. Negligence § 3—**

In this action to recover for lead poisoning resulting from the use of a commercial paint ingredient containing lead monoxide, based on the alleged negligence of the seller in selling and delivering the compound without labeling the containers "poison" in violation of G.S. 90-77, it *is held* nonsuit should have been entered, since, construing G.S. 90-77 in the light of its caption and the context of the statute, the statute relates to pharmacy and the sale of medicines containing poisonous ingredients, and, under the doctrine of *ejusdem generis*, does not apply to the sale of a lead compound used in a commercial paint ingredient.

APPEAL by defendant from *Armstrong, J.*, at October 1955 Regular Term of ROWAN, and *Crissman, J.*, at May 1956 Regular Term of ROWAN, as No. 530 at Fall Term, 1956, carried over to Spring Term, 1957.

Civil action instituted 12 August, 1955 to recover damages allegedly resulting from actionable negligence of defendant in selling and delivering to plaintiff poisonous compound of lead, lead monoxide, commonly known as "Litharge," without the word "poison" on the containers wherein such compound was sold and delivered, in violation of a statute of the State of North Carolina, G.S. 90-77, heard, first, upon motion of defendant, on special appearance, to quash the summons, and the attempted service thereof.

I. The record discloses (1) that summons issued to the sheriff of Guilford County for "Yoder & Gordon Company, Inc., by serving James P. Oliver, Route 9, Box 529, Greensboro, N. C., as agent of the defendant above named" was served on James P. Oliver on 15 August, 1955;

and (2) that summons issued to sheriff of Wake County for "Yoder & Gordon Company, Inc., by serving the Secretary of State of North Carolina, as agent for said defendant . . ." was served 15 August, 1955, on "Thad Eure, Sec. of State of the State of North Carolina at Raleigh, N. C., said Secretary being the process agent for the defendant named in the order of this summons."

Defendant Yoder & Gordon Company, Inc., appearing specially in this action solely for the purpose of moving, moved that each summons in the action be quashed, and that the attempted service thereof on defendant be set aside for reasons stated.

The cause came on for hearing before Armstrong, Judge Presiding at the regular October-November Term of Superior Court of Rowan County on the special appearance and motion of defendant to quash service of summons; and the parties having agreed that the matter might be determined and the order and judgment of the court signed out of term and outside Rowan County, and the court having received and considered evidence in the form of oral testimony, exhibits, affidavits and the verified complaint, and having heard arguments and considered briefs, submitted by counsel for the plaintiff and for the defendant, the court made specific findings of fact, upon which "THE COURT CONCLUDES AS A MATTER OF LAW THAT: This Court has jurisdiction of the person of the defendant Yoder & Gordon Company, Inc., a Maryland Corporation, by virtue of service of summons upon the Secretary of State of North Carolina pursuant to G.S. 55-38, *et seq.* as amended by Session Laws, 1955, Ch. 1143.

"This court also has jurisdiction of the person of the defendant Yoder & Gordon Company, Inc., a Maryland corporation, by virtue of service of summons upon J. P. Oliver, who, upon the facts herein found, is, and was at all times herein relevant, a managing agent transacting business in North Carolina for the defendant within the meaning of G.S. 1-97."

And thereupon the court ordered:

"1. That the Motion to Quash Service of Summons be, and the same hereby is, denied.

"2. That the defendant pay the costs of this Special Appearance."

Defendant appealed from the judgment to Supreme Court of North Carolina, "exceptions to said judgment to be hereafter assigned."

The exceptions set forth are as shown in the record and case on appeal.

Upon the merits of the case:

Plaintiff alleges in his complaint that on or about the 16th day of April 1954 defendant negligently sold, and negligently delivered to plaintiff in the State of North Carolina a quantity of poisonous compound of lead, to wit: lead monoxide, commonly known as Litharge,

without labeling same with the word "poison" in violation of a statute of North Carolina, G.S. 90-77; that plaintiff made use of "said poisonous compound of lead" in the month of May 1954 in the course of his business as a painter and painting contractor, without knowing or being warned that such compound was poisonous whereby he might have taken appropriate precaution; that as a direct and proximate result of "the aforesaid acts of negligence on the part of defendant" he, the plaintiff, "contracted lead poisoning," to his great injury; and that "The acts of negligence on the part of defendant which proximately caused said damage to plaintiff consisted in:

"(a) *Selling* . . . and (b) *Delivering* a poisonous compound of lead, to wit: Lead monoxide, to plaintiff without labeling 'poison' the containers wherein such compound 'was sold'" and "'was delivered' in violation of a statute of North Carolina."

And upon trial in Superior Court plaintiff in pertinent part testified substantially as follows: "About the end of April 1954, I obtained a job to paint some water tanks of the city of Salisbury . . . three . . . a million gallon water tank, a two hundred and fifty thousand gallon water tank and a fifteen thousand gallon . . . The materials required for the painting of the interior of these tanks were mostly red lead and litharge, red lead and linseed oil and turpentine, ready mixed red lead in cans and dry litharge . . . I obtained some litharge to do this job from Yoder & Gordon Company out of Norfolk, Va., the defendant in this case . . . eighty pounds dry litharge . . . that is the litharge I bought for this job . . . containers . . . were labeled 'Lev-L-Lite Paint Products—Litharge—Manufactured by Yoder & Gordon Co.—Established 1904—Norfolk, Virginia.' All labels were the same. The material inside all the cans appeared to be the same. There was no poison label on any one of these cans . . . I had never bought any litharge before this. I had never dealt with litharge or had anything to do with it. I did not know that litharge was a poisonous compound . . . that litharge contained lead monoxide. The only thing I knew about litharge was the specifications that required me to put two pounds of litharge to the gallon of paint. We mixed it according to specifications . . . 80 pounds @ 25c—$20.00—is the price I paid for this litharge. I paid Yoder & Gordon Company. This litharge was delivered to my home, 831 Jackson Street, Salisbury. Yoder & Gordon paid freight on it. As to how this million gallon water tank was cleaned, the specification called for cleaning interior . . . and applying two coats red paint . . . We opened up a five-gallon can of red lead . . . We had to mix ten pounds of this dry litharge inside that red lead. The specifications said pour it in slowly and stir . . . While we were stirring it up it boils up in your face . . . We mixed that paint and after we

got it mixed we applied it to the wall . . . We breathed some of this powder . . . it was determined I did have lead poisoning . . ."

And on cross-examination plaintiff stated: ". . . I did read section 5.2 in the specifications relating to painting interior surfaces of the one-million gallon tank . . . where it says: 'All interior surfaces . . . shall be given two coats of red lead, linseed oil paint, conforming to Federal Specifications TT-P-86a, Type 1, except said Federal Specifications shall be modified by the addition of two pounds per gallon of dry litharge, to be added shortly before application. The dry litharge is to be added slowly while the paint is stirred.' We went over that part of the contract very carefully to make sure we mixed our paint, etc. At that time I didn't undertake to discover what litharge was . . . When I saw this word litharge I had never seen the word before. I did not undertake to ask anyone what it was . . . I did go to the phone and call Norfolk, Virginia, and tell them to ship me some litharge along with other materials . . ."

Plaintiff offered other evidence not necessary to be recited for consideration of the determinative question on this appeal.

The case was submitted to the jury on issues as to (1) negligence of defendant, (2) contributory negligence of plaintiff, and (3) damages, all of which were answered favorable to plaintiff.

To judgment in accordance therewith defendant excepted and appeals to Supreme Court, and assigns error.

*Lewis P. Hamlin, Jr., and Clarence Kluttz for Plaintiff Appellee.*

*David S. Sykes, C. Theodore Leonard, Jr., and W. T. Shuford for Defendant Appellant.*

WINBORNE, C. J.   Assuming that the court below properly overruled the motion of defendant, made upon special appearance, to quash the service of summons, as hereinabove related, there arises, upon exception to the denial of defendant's motions for judgment as of nonsuit, assigned as error, the basic question as to whether the provisions of the statute, G.S. 90-77, are applicable to the facts of this case, and available to plaintiff for support of a cause of action against defendant as alleged in the complaint.

As to this question, the history of the statute considered in context as shown by the original act, and subsequent codifications, on which it is founded, indicate a legislative intent to restrict its provisions to the profession of pharmacy, and its relation to pharmaceutics,—the science of preparing, using and dispensing of medicines, and not to manufacture and sale of paint products for commercial purposes. The intent and spirit of an act controls in its construction. *Dyer v. Dyer*, 212 N.C. 620, 194 S.E. 278.

The statute G.S. 90-77 comprises in substantial conformity Sections 20 and 28 of Chapter 108 of 1905 Public Laws. This act is entitled "An Act to Revise, Consolidate, and Amend the Pharmacy Laws." By the enactment of it (thirty-one sections), the General Assembly created the North Carolina Pharmaceutical Association and declared its object "to unite the pharmacists and druggists of this State for mutual aid, encouragement and improvement, to encourage scientific research, develop pharmaceutical talent, to elevate the standard of professional thought and ultimately restrict the practice of pharmacy to properly qualified druggists and apothecaries." It declared the responsibility of persons engaged in the sale and dispensing of "drugs, chemicals and medicine." And in general the act prescribed rules and regulations for the Association and the ethical practice of the profession in keeping with the declared object.

When the Act of 1905 was codified, Section 20 became Revisal Section 4489, under part VII entitled "Pharmacists" in Chapter 95 entitled "Health." And Section 28 became Revisal 3655 under part XXVII entitled "Professions" in Chapter 81 entitled "Crimes." And in codification in Consolidated Statutes of 1919, Revisal Sections 4489 and 3655 were consolidated into C.S. 6671, under part 2 (entitled "Dealing in Specific Drugs Regulated") of Article 3 (entitled "Pharmacy") of Chapter 110 (entitled "Medicine and Allied Occupations"). Part 1 of Article 3 of Chapter 110 is captioned "Practice of Pharmacy." And when codified in the General Statutes, C.S. 6671 became G.S. 90-77, under identical captions.

Moreover, in the codifications it is noted that the word "oxide" appearing in the last proviso of Section 20 of the 1905 Act is spelled "dioxide." But read in context it is seen that this last proviso clearly relates to medicinal dosage of poisonous substances, and such products as are dispensed by pharmacists.

Decisions of this State are uniform in holding that if the meaning of a statute is in doubt reference may be had to the title and context as legislative declarations of the purpose of the act. S. v. Woolard, 119 N.C. 779, 25 S.E. 719; Machinery Co. v. Sellers, 197 N.C. 30, 147 S.E. 674; Dyer v. Dyer, supra; S. v. Keller, 214 N.C. 447, 199 S.E. 620; Smith v. Davis, 228 N.C. 172, 45 S.E. 2d 51, 174 A.L.R. 643; In re Hickerson, 235 N.C. 716, 71 S.E. 2d 129; S. v. Lance, 244 N.C. 455, 94 S.E. 2d 335.

In S. v Woolard, supra, Clark, J., later C. J., said: ". . . the title is part of the bill when introduced, being placed there by the author, and probably attracts more attention than any other part of the proposed law, and if it passes into law the title thereof is consequently a legislative declaration of the tenor and object of the act . . . Consequently

when the meaning of an act is at all doubtful, all the authorities now concur that the title should be considered."

The text writers say that the construction and operation of statutes relating to poison are governed by the general principles applicable to all statutes; and such statutes, where penal in nature, are strictly construed and will not be extended by implication beyond their express terms. Indeed the doctrine of *ejusdem generis* applies in construing a statute pertaining to the labeling of products containing poison. 72 C.J.S. pp. 164-5. That is, "in the construction of laws, wills, or other instruments, the *ejusdem generis* rule is that where general words follow an enumeration of persons or things, by words of a particular or specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned." Black's Law Dictionary 3rd Ed. See also *Trust Co. v. Wolfe,* 245 N.C. 535, 96 S.E. 2d 690.

And it is stated in 72 C.J.S. 165 that "statutes requiring the labeling of poisons ordinarily do not apply to articles of merchandise in the manufacture of which poison is incidentally used." Furthermore, "a statute requiring persons selling medicine belonging to a class known as poisonous to mark the package with the word 'poison' has been held to apply only to the sale of poisons usually sold by druggists and apothecaries and not to poisonous articles other than medicine . . ." *Boyd v. Frenchee Chemical Corp.,* D. C. N.Y., 37 Fed. Supp. 306; *McClaren v. G. S. Robins & Co.,* 349 Mo. 653, 162 S.W. 2d 856.

In the *Boyd case, supra,* this headnote epitomizes the opinion: "2. The purpose of Pennsylvania statute providing for the practice of pharmacy was to regulate the compounding of physicians' prescriptions, preparing drugs, and dispensing them, or other products of the apothecary's calling, including poisonous substances, as an incident to the practice of pharmacy, and not to regulate or control the sale of cleaning preparation which happened to be poisonous." And it is held in this case that "Although definition of 'poison' contained in Pennsylvania statute regulating the practice of pharmacy was broad enough to embrace a commercial shoe cleaner, the statute taken as a whole could not be construed as intended to regulate the sale of such products having no connection with pharmacy so as to require that cleaner be labeled as poison in accordance with statute."

Moreover in the *McClaren case, supra,* the Supreme Court of Missouri held that an Illinois statute penalizing "every druggist who sells and delivers any arsenic . . . or other substance . . . usually denominated as poisonous without having the word 'poison,' does not under the *'ejusdem generis'* rule manifest an intent to include 'carbon tetrachloride' therein, which is not a drug, but a grease solvent, sold com-

mercially as a cleaning fluid, and hence the sale of such a substance by manufacturer without labeling it as poison did not constitute negligence."

The reasoning of these cases is deemed sound and persuasive.

Hence in the light of the caption and context of the statute in hand, G.S. 90-77, read in connection with the whole act entitled "Pharmacy" this Court holds as a matter of law that the sale and delivery of a lead compound, such as lead monoxide or litharge, used in commercial paints, does not come within the purview of the provisions of the statute requiring the labeling of containers in which it is sold by the manufacturer with the word "poison."

Therefore, the motion of defendant for judgment as of nonsuit should have been allowed.

Judgment reversed.