LITHIUM CORPORATION OF AMERICA, INC., PETITIONER v. TOWN OF BESSEMER CITY, A NORTH CAROLINA MUNICIPAL CORPORATION; GEORGE HOOK, MAYOR; P. O. LUTZ, MILES L. RHYNE, CARL G. CARPENTER, WALTER J. HEATHERINGTON, ROY J. BULLARD, JR., AND CEASAR RAMSEY, MEMBERS OF THE GOVERNING BOARD OF THE TOWN OF BESSEMER CITY, NORTH CAROLINA, RESPONDENTS.

AND

SOUTHERN RAILWAY COMPANY, PETITIONER v. TOWN OF BESSEMER CITY, A NORTH CAROLINA MUNICIPAL CORPORATION; GEORGE HOOK, MAYOR; P. O. LUTZ, MILES L. RHYNE, CARL G. CARPENTER, WALTER J. HEATHERINGTON, ROY J. BULLARD, JR., AND CEASAR RAMSEY, MEMBERS OF THE GOVERNING BOARD OF THE TOWN OF BESSEMER CITY, NORTH CAROLINA, RESPONDENTS.

(Filed 8 April, 1964.)

1. **Constitutional Law § 6; Municipal Corporations § 2—**

    Changes in municipal boundaries are legislative matters, and the exercise of legislative authority by a municipality in annexing additional territory is not subject to judicial interference.

2. **Constitutional Law § 10—**

    It is the function of the courts to construe a statute of doubtful meaning.

3. **Administrative Law § 4—**

    It is the function of the courts in proper instances to determine whether an administrative board acted arbitrarily, unreasonably or unjustly in applying the provisions of a statute.

**4. Statutes § 5—**

　　The intent of the Legislature controls the interpretation of a statute.

**5. Same—**

　　When the meaning of a statute is doubtful, the courts may consider the history of the legislation in question in connection with the object, purpose and language of the statute in ascertaining the legislative intent.

**6. Same—**

　　Where clauses of a statute setting forth the requirements for the application of the statute are connected by the conjunctive "and", it is generally necessary that the conditions set forth in both clauses be met in order for the statute to be applicable.

**7. Municipal Corporations § 2—**

　　In order for an area to be subject to annexation by a municipality under the provisions of G.S. 160-453.4(c), it is necessary that at least 60 per cent of its total number of lots and tracts be in use for residential, commercial, industrial, institutional or governmental purposes and also that at least 60 per cent of its total acreage, not counting the acreage used at that time for commercial, industrial, governmental or institutional purposes, be subdivided into lots and tracts of five acres or less in size.

**8. Same—**

　　An area owned by two industrial concerns and used exclusively for commercial purposes does not comply with the literal requirements of G.S. 160-453.4(c) or come within the reasonable intent and application of the statute, and an ordinance of a municipality annexing such area must be set aside by the courts.

APPEAL by petitioners, Lithium Corporation of America, Inc., and Southern Railway Company, from *Riddle, S.J.,* September 16, 1963, Civil Session of GASTON.

*Mullen, Holland & Cooke and Davis & White for petitioners.*
*Henry L. Kiser and Hugh W. Johnston for respondents.*

MOORE, J. This is a proceeding for extension of the corporate limits of Bessemer City, N. C., a municipality having a population of less than 5000. The proceeding is had pursuant to Chapter 160, Subchapter VI, Article 36, Part 2 of the General Statutes of North Carolina (G.S. 160-453.1 to G.S. 160-453.12).

On 19 November 1962 the City's governing board adopted a resolution of intent (G.S. 160-453.5) to consider annexation of an area of 69.62 acres contiguous to the city's western boundary.

The northern portion of the area proposed for annexation consists of an arc-shaped segment of the Southern Railway Company right of

way, about 1600 feet in length. State Highway 216, running generally east and west, crosses the area a short distance south of the railroad. Lithium Corporation of America, Inc., (Lithium) owns all of the land in the area except that embraced within the railroad and highway right of ways. A road leading from the highway southwardly bisects the area. Between the highway and railroad right of ways there is a small parcel, about 2½ acres, of vacant land. From the bisecting road westwardly to the highway there is about 25 acres which is vacant except for a 4-acre artificial lake which was constructed by Lithium and is maintained by it as a stand-by source of water should an emergency require its use. Between the road and the city limits are about 30 acres upon which is located Lithium's plant, buildings and structures, including some lagoons. The area sought to be annexed contains no residences, and it has not been subdivided into streets and lots; it consists only of the properties of Lithium and the Railway Company. To the north, west and south of the area is open and undeveloped country. Lithium owns 425 acres contiguous to the area. The land to the east of the area and within the city limits is vacant and undeveloped for several hundred feet except along the highway. Lithium has about 180 employees; it purchases from the city approximately 15 million gallons of water per month; Lithium provided the water lines and a pumping station at a cost of $52,000. The city provides no other utilities or services to Lithium. If the annexation becomes effective Lithium will pay annually about $31,000 in city taxes.

A report setting forth plans for extension of services to the area was approved by the governing board of the municipality and filed with the Clerk. On 14 January 1963 a public hearing was held pursuant to notice given. Lithium and the Railway Company had representatives at the hearing and opposed annexation. On 4 February 1963 the governing board adopted an ordinance annexing the area.

In apt time Lithium and the Railway Company, in separate petitions, requested review pursuant to G.S. 160-453.6. Each alleges, among other things, that the area does not qualify for annexation in that it is not "developed for urban purposes" in accordance with the requirements of G.S. 160-453.4(c), which provides as follows:

"The area to be annexed must be developed for urban purposes. An area developed for urban purposes is defined as any area which is so developed that at least sixty per cent (60%) of the total number of lots and tracts in the area at the time of annexation are used for residential, commercial, industrial, institutional or governmental purposes, and is subdivided into lots and tracts such

that at least sixty per cent (60%) of the total acreage, not count-
ing the acreage used at the time of annexation for commercial, in-
dustrial, governmental or institutional purposes, consists of lots
and tracts five acres or less in size."

The annexation ordinance recites that the area contains two tracts,
none residential, one commercial and one industrial, that the "area is
developed for urban purposes as defined by the statutes in that 100
per cent of the total number of lots and tracts in the area are used for
industrial and commercial purposes."

In superior court the petitions were consolidated for hearing. It was
stipulated by petitioners and respondents "that all of the property un-
der consideration for annexation is either commercial or industrial
and that there is no subdivision of any of the acreage into tracts of five
acres or less. That the Southern Railway right of way is used for com-
mercial purposes and that the land belonging to Lithium . . . is used
for industrial purposes."

The court entered judgments, concluding that "the character of the
area to be annexed is developed for urban purposes and meets the re-
quirements of General Statute 160-453.4," and affirming in all particu-
lars the action of the municipality in annexing the subject area. Both
petitioners appeal.

Petitioners contend that to meet the statutory test for annexation
"some portion of the subject area must consist of or be composed of
lots and tracts five acres or less in size, not counting the acreage used
by Lithium and Southern Railway for industrial and commercial pur-
poses." Petitioners say that G.S. 160-453.4(c) contains two clauses
setting up standards for determining whether an area is "developed
for urban purposes" — an area is so developed, (1) if at least 60% of
the total number of lots and tracts in the area at the time of annexa-
tion are used for residential, commercial, industrial, institutional or
governmental purposes, *and* (2) if the area is subdivided into lots and
tracts such that 60% of the total acreage, not counting the acreage used
at the time of annexation for commercial, industrial, governmental or
institutional purposes, consists of lots and tracts of five acres or less in
size. They point out that the two clauses are connected by the con-
junctive "and," and contend that the clauses are coordinate and mu-
tually complementary, and that an area does not meet the test, "de-
veloped for urban purposes," unless it substantially complies with the
requirements of both clauses of the statute. Ordinarily, when the con-
junctive "and" connects words, phrases or clauses of a statutory sent-
ence, they are to be considered jointly. 50 Am. Jur., Statutes, s. 281, p.
267. Obviously the subject area does not comply with the last clause
of the second sentence of G.S. 160-453.4(c).

On the other hand, respondents contend that an area may be annexed if it meets the standards set by the first of the clauses, that it need not comply with both. The subject area clearly complies with the requirements of the first clause, for more than 60%, 100% in fact, of the lots and tracts are used (according to the stipulation of the parties) for commercial and industrial purposes.

The narrow question thus presented is not without difficulty. Changes in municipal boundaries are legislative matters, and the exercise of legislative permission therefor is not subject to judicial interference. *Dunn v. Tew*, 219 N.C. 286, 13 S.E. 2d 536; *Highlands v. Hickory*, 202 N.C. 167, 162 S.E. 471; *Lutterloh v. Fayetteville*, 149 N.C. 65, 62 S.E. 758. However, where a statute is of doubtful meaning it is the function of the courts to construe it. This function encompasses the duty, in some instances, to determine whether administrative authority is applying the provisions of the statute in an arbitrary, unreasonable and unjust manner, not in keeping with legislative intent. *In re Hickerson*, 235 N.C. 716, 71 S.E. 2d 129; *Duncan v. Carpenter*, 233 N.C. 422, 64 S.E. 2d 410; *Hilgreen v. Cleaners & Tailors, Inc.*, 225 N.C. 656, 36 S.E. 2d 252.

The spirit and intent of an act controls its interpretation. *Porter v. Yoder & Gordon Co.*, 246 N.C. 398, 98 S.E. 2d 497; *Smith v. Davis*, 228 N.C. 172, 45 S.E. 2d 51. When the meaning of a statute is doubtful the history of the legislation may be considered in connection with the object, purpose and language of the statute in order to arrive at its true meaning. *Cab Co. v. Charlotte*, 234 N.C. 572, 68 S.E. 2d 433. The statute we are considering is section 4, Chapter 1010, Session Laws of 1959. It was not copied from the laws of other states. It is a result of a study and recommendations made by the Municipal Government Study Commission which was established in accordance with Joint Resolution 51 of the General Assembly of 1957. The Commission made two comprehensive reports, one dated November 1, 1958, the other February 26, 1959. We repeat here in substance, except where quoted verbatim, some pertinent comments and recommendations of the Commission (numbering and paragraphing ours):

(1). Standards for changing municipal boundaries should be more specific than formerly. It is for the Legislature, not judicial or administrative agencies, to fix policy. It is a matter for statewide policy, and the Legislature should define the type and character of land which should be annexed by municipalities. Report 1, pp. 20, 21.

(2). The factors important in deciding what lands should be annexed are: (a) the actual distribution of developed and vacant land

in an area, (b) the extent to which the area needs municipal services, (c) the extent to which the owners of developed property in the area desire municipal services, (d) the availability inside the corporate limits of land suitable or desirable for residential, commercial and industrial development, (e) the extent to which municipal services can be provided, and (f) the impact of services and taxation upon lands being annexed. Report 2, pp. 7, 8.

(3). ". . . (T)he General Assembly should not delegate unlimited power to the governing boards. Exercise of discretion to extend corporate boundaries must and should be subject to general standards or limitations . . . And we think the primary standards should be . . . that the land to be annexed is either developed for urban purposes or is reasonably expected to be so developed in the near future . . ." Report 2, p. 9.

(4). "We do not believe that a precise municipal boundary can be fixed by reference to specific factual standards. Somewhere in the process there must be the exercise of judgment by some board or agency. Therefore, whether the decision is made by a city council or a state administrative board, the most practical method of reviewing the administrative decision is to provide judicial review. . . . And the scope of review must necessarily be whether the agency making the decision made a reasonable decision in accord with the statutory standards. This, we believe, is the best protection for the individual property owners." Report 2, p. 10.

(5). The Commission recommends that an area to be qualified for annexation must be developed for urban purposes or undergoing urban development. Land is " 'undergoing urban development' if (1) there has been substantial subdivision of land into lots and tracts of five acres or less, and/or (2) that there has been substantial residential, commercial or industrial development along the streets or highways or in small communities, settlements or subdivisions, and/or (3) there is a reasonable expectation that land not already subdivided or developed will soon be developed by reason of being a logical service area into which municipal water and sewer systems should be extended, or by reason of being adjacent to land now subdivided or developed for urban purposes." Report 2, p. 11.

(6). "The requirement that land be 'undergoing urban development' is made general on purpose. . . . (M)ore specific definition would rob the cities of necessary flexibility in fixing boundary lines. In short, we believe the legislative standard should act as a brake only with respect to attempted annexation of large tracts of agricultural or vacant land where no evidence of urban development can be shown."

The reports of the Commission do not furnish a direct answer to the specific question with which we are here concerned, but they are helpful in determining the intent of the Legislature on this point. The Commission recognized that no definition of the phrase, "developed for urban purposes" could be formulated which would provide exact guidance for municipalities under any and all circumstances. It concluded that standards should be more specific than under prior annexation laws, but not so specific as to exclude the necessity in some instances for the exercise of judgment and discretion. Large tracts of agricultural or vacant lands, where no evidence of urban development can be shown, should not be annexed in any event, except upon petition of the landowners. (G.S. 160-452). Areas not adaptable to municipal services should not be annexed for the arbitrary purpose of imposing tax burdens. In the formulation of plans for legislation, the Commission centered attention upon, and made recommendations having in mind, typical suburban areas undergoing development, containing subdivisions with streets, lots and tracts, having a substantial portion in actual use, and being adaptable to water, sewer and other service extensions. The Commission recognized that there would be variations from this pattern.

The General Assembly adopted a standard containing two tests for determining availability for annexation. (1) *the use test* — that not less than 60% of the lots and tracts in the area must be in actual use, other than for agriculture, and (2) *the subdivision test* — not less than 60% of the acreage which is in residential use, if any, and is vacant must consist of lots and tracts of five acres or less in size. Bessemer City contends that the *use test* is alone sufficient to qualify an area for annexation, and the subject area, which contains two tracts 100% in use for commercial and industrial purposes, complies with statutory standards. To hold that this test alone is sufficient will lead to absurd and unintended results. Under such construction of the statute a municipality could annex a single lot. It could annex a segment of a railroad or power line right of way and nothing more; it could annex a single service station, store or dwelling. Certainly no such result was intended without the request and consent of the landowner pursuant to G.S. 160-452. The fact that the General Assembly connected the two test clauses with the conjunctive "and," and the clear abuses and hardships which a literal application of the *use test,* if alone applied, would produce, leads us to the conclusion that the legislative intent is that both tests be complied with.

However, it must be conceded that literal insistence upon the application of both tests might in some extreme and improbable circum-

stances bring about absurd results adverse to municipalities. For example, a large suburban area might be subdivided into streets, blocks and lots, and all thereof be in actual use for commercial purposes (stores, banks, restaurants, offices, parking lots, etc.) — no residences. Under the literal application of both tests, it would not be subject to annexation. Such circumstances are, however, extremely unlikely; and a municipality would undoubtedly find it possible to fix the boundaries of the area proposed for annexation so as to include enough vacant or residential property to comply with the statute.

The difficulties of applying the standards in extreme cases is the reason the Commission recommended a provision for court review to determine "whether the agency making the decision made a reasonable decision in accord with statutory standards." The General Assembly made provision for such review. G.S. 160-453.6.

If a municipality clearly complies with the standards of G.S. 160-453.4(c), there is nothing to review with respect to the availability of an area proposed for annexation. Where compliance is in doubt, the determination must be made upon the facts in the particular case.

In our opinion the subject area does not comply with the literal requirement of G.S. 160-453.4(c). Furthermore, the annexation of such area is not within the reasonable intent and application of the statute.

Parenthetically, the problem in this case arose by reason of the stipulation of the parties as to use. All of the evidence, except the stipulation, tends to show there is vacant, unused land in the area. There is a small vacant tract between the highway and the railroad. There is a 25-acre tract which is vacant, except for a 4-acre lake which is maintained on a stand-by basis. This tract, except the lake, is vacant, and according to the evidence is suitable for future residential development. If there had been no stipulation, the area would so clearly have been unavailable for annexation as not to permit debate.

The judgment below is

Reversed.