TEXFI INDUSTRIES, INC., A CORPORATION v. THE CITY OF FAYETTE-VILLE, A MUNICIPAL CORPORATION, BETH FINCH, MAYOR, J.L. DAWKINS, WAYNE WILLIAMS, MILDRED EVANS, BILL HURLEY, GEORGE MARK-HAM, MARION GEORGE, MEMBERS OF THE CITY COUNCIL OF THE CITY OF FAYETTEVILLE, AND A.D. JOHNSON, ACTING TAX COLLECTOR FOR THE CITY OF FAYETTEVILLE

No. 126

(Filed 15 August 1980)

1. **Municipal Corporations § 2– annexation hearing – notice by publication in newspaper – due process**

    Publication of notice of a public hearing on annexation in a newspaper pursuant to G.S. 160A-24 does not provide inadequate notice to property owners affected by the annexation in violation of their right to due process.

2. **Constitutional Law § 20– equal protection – when strict scrutiny test is used**

    When a governmental act classifies persons in terms of their ability to exercise a fundamental right or a governmental classification distinguishes between persons in terms of any right upon a suspect basis, the "strict scrutiny" standard requires the government to demonstrate that the classification is necessary to promote a compelling governmental interest. However, when a statute or action does not involve a suspect class or a fundamental right, equal protection is not violated where the distinctions drawn by the statute or action bear some rational relationship to a conceivable legitimate governmental interest.

3. **Municipal Corporations § 2— annexation referendum – no right to vote by corporation – equal protection**

A corporation is not denied equal protection of the laws because resident voters but not corporations are given the right to vote in an annexation referendum held pursuant to G.S. 160A-25.

Justices Exum and Carlton dissenting.

ON discretionary review of the decision of the Court of Appeals reported in 44 N.C. App. 268, 261 S.E. 2d 21 (1979), affirming judgment of *McConnell, J.*, entered at the 30 October 1978 Session of CUMBERLAND Superior Court.

Plaintiff is a Delaware corporation which has its headquarters in Greensboro, N.C., with a place of business in Fayetteville, Cumberland County, N.C. Plaintiff owns personal property which is situated in Cumberland County and leases real property under an agreement which obligates it to pay all real property taxes on the leased premises.

On 27 September 1976, the Fayetteville City Council, pursuant to G.S. § 160A-24, *et seq.*, adopted a resolution to consider the annexation of a certain area of land within which property leased by plaintiff and other commercial and industrial enterprises is located. No residences are situated within the area. The resolution scheduled a public hearing for 25 October 1976 at the Fayetteville City Hall. Notice of the council's action was published in *The Fayetteville Observer* on 28 September 1976, 5 October 1976, 12 October 1976, and 19 October 1976. The hearing was held as scheduled and no opposition to the proposed annexation was voiced. Accordingly, the area was annexed to the City of Fayetteville.

On 8 December 1977 plaintiff initiated this action seeking an injunction restraining the enforcement of the previously passed ordinance. Plaintiff alleged that the annexation statutes under which Fayetteville proceeded were unconstitutional on their face and as applied because: (1) the applicable notice provisions of G.S. § 160A-24 were insufficient to give parties affected by the annexation reasonable notice of the pendency of the action; and (2) the statute, which gives resident voters but not corporations in the area proposed for annexation a right to vote in a referendum on the proposal, denies plaintiff the equal protection of the law.

Texfi Industries v. City of Fayetteville

Within the time allowed, defendants filed a motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, asserting that the complaint failed to state a claim upon which relief could be granted, lack of subject matter jurisdiction, lack of plaintiff's capacity and standing to sue, laches, and equitable estoppel.

On 1 November 1978, the trial court entered judgment granting defendants' motion to dismiss on the grounds that the complaint failed to state a claim upon which relief could be granted and that plaintiff, as a corporate lessee, lacked standing to sue. Plaintiff appealed from the judgment and defendants cross-appealed for failure of the trial court to grant the motion to dismiss on the other grounds upon which they relied.

The Court of Appeals reversed the trial court's ruling that plaintiff had no standing to sue. It agreed with the trial court's rulings that plaintiff's equal protection and procedural due process claims failed to state claims upon which relief could be granted and affirmed the judgment dismissing the action.

Plaintiff gave notice of appeal to this court and, in the alternative, petitioned us for discretionary review pursuant to G.S. § 7A-31. Defendants moved to dismiss plaintiff's appeal and petitioned for discretionary review of that part of the Court of Appeals decision holding that plaintiff had standing to sue. We allowed plaintiff's petition and disallowed defendants' motion and petition.

*McCoy, Weaver, Wiggins, Cleveland and Raper, by L. Stacy Weaver, Jr., and Reginald M. Barton, Jr., for plaintiff-appellant.*

*Robert C. Cogswell, Jr., for defendant-appellees.*

BRITT, Justice.

The question of plaintiff's standing to sue is not before us inasmuch as we denied defendants' petition for discretionary review of the holding of the Court of Appeals that plaintiff had such standing. We now agree with the Court of Appeals with respect to its holding on the questions of due process and equal

protection of the law; therefore, we affirm the decision of the Court of Appeals.

The issue of standing having been resolved in plaintiff's favor we turn now to a brief overview of the substantive law as it relates to the question of annexation.

The 1957 Session of the General Assembly authorized the creation of the Municipal Government Study Commission, directing it to make a comprehensive study of the problems facing municipalities in North Carolina in an age of rapid urbanization. Res. 51, 1957 N.C. Sess. Laws. Among the Commission's many conclusions in its final report to the General Assembly, the body recommended that the question of municipal annexation be made a matter of state-wide policy. Municipal Government Study Commission, Report 21 (1958). The Commission expanded upon its recommendation in a supplemental report several months later. The recommendations propounded in the supplemental report, Municipal Government Study Commission, Supplemental Report 11-13 (1959), formed the basis for a major overhaul of the manner in which North Carolina's municipalities annexed land. Before 1959, much of the annexation which occurred was the result of the petition of all of the affected landowners [1] or by a local act passed by the General Assembly. Municipal Government Study Commission, Supplemental Report 5-6 (1959). The remainder of the annexations proceeded under provisions of the General Statutes which called for referenda on the proposed annexations. G.S. §§ 160-445 to -451 (1952). The Commission observed that two out of every five proposals which were submitted under the latter method were defeated. Municipal Government Study Commission, Supplemental Report 5 (1959). After noting that desirable proposals had often been defeated at the polls under the referendum method and that municipalities were increasingly resorting to the legislative process when they contemplated large-scale annexation plans, the Commission stated its thesis:

---

[1]Under the provisions of G.S. § 160-452, all of the landowners in an area having fewer than 25 voter-residents could petition a municipality for annexation. G.S. § 160-452 (1952). The substance of this provision is now codified as G.S. § 160A-31 (1976).

Annexation involves the continuous extension of major utility facilities and other municipal services to parts of the urban area which are now or soon will become parts of the densely populated and congested urban core. Contrary to the impression given by a number of North Carolina cities in recent years, annexation proposals should not be periodic and large-scale in nature. Nor should annexation be considered outside the context of long-range planning in any community. Rather, it should be considered as an integral part of the planning process.

*Id.* at 6. Against this background, the 1959 Session of the General Assembly undertook a major revision of the annexation laws of the state. *See* 1959 N.C. Sess. Laws c. 1009, 1010. Codified in Chapter 160 of the General Statutes, the new statutes sought to implement a uniform scheme of annexation throughout the state. Both of the new acts, as well as the provisions of former G.S. §§ 160-445 to -453, were subsequently recodified as Article 4A of Chapter 160A of the General Statutes by the 1973 Session of the General Assembly. 1973 N.C. Sess. Laws c. 426. Entitled "Extension of Corporate Boundaries", Article 4A is divided into four parts, three of which merit brief examination[2]

Besides setting out the procedure for annexation by petition, G.S. § 160A-31 (1976), Part One governs annexation by ordinance. Upon publication of public notice in a newspaper in the county with general circulation in the municipality once a week for four successive weeks[3], the municipal governing body is authorized to hold a public hearing. The municipality is thereupon empowered to adopt an ordinance annexing any contiguous tract of land which is not already embraced within the boundaries of another municipality. If, at the public hearing on the proposed annexation, a petition is filed and signed by at least fifteen percent of the qualified voters resident in the area

---

[2]Part Four of Article 4A concerns the annexation of non-contiguous areas. G.S. §§ 160A-58 to -58.6 (1976). It has no relevance to the case at bar and will not be discussed.

[3]If there is no such newspaper, public notice may be given by posting notice in five or more public places in the municipality. G.S. § 160A-24 (1976).

proposed for annexation, the question must be submitted to a vote of the qualified voters of the area proposed for annexation. *See generally* G.S. §§ 160A-24 to -28 (1976). In the present case, the City of Fayetteville proceeded under the provisions of Part One.

Part Two governs annexation by municipalities with populations less than 5,000 persons. *See generally* G.S. §§ 160A-33 to -44 (1976 and Supp. 1979); *see also* North Carolina League of Municipalities, Mechanics of Annexation for Municipalities of Less than 5,000 (1978). Part Three regulates annexation by municipalities with populations greater than 5,000 persons. *See generally* G.S. §§ 160A-45 to -56 (1976); *see also* North Carolina League of Municipalities, Mechanics of Annexation for Municipalities of 5,000 or more (1978). Both procedures provide for public notice of the municipality's intention to annex a specific area, as well as a public hearing on the question to provide the affected residents with an opportunity to be heard on the issue. Upon compliance with the requirements of notice and hearing, the municipal governing board may, at a regular or special meeting held no earlier than seven days after the public hearing, adopt an ordinance extending the corporate limits to include areas meeting the statutory requirements governing the character of the area to be annexed.

The procedures employed in Part One differ from those embodied in Parts Two and Three in two significant respects. First, Part One imposes no requirements which deal with the character of the area to be annexed provided that it is contiguous to the municipality. Second, municipal action under Part One is subject to veto by the voters resident in the area to be annexed if a petition demanding a referendum on the annexation proposal is signed and filed by at least fifteen percent of the voters resident in the affected area.

While Part One is fully in force in Cumberland County, Parts Two and Three are subject to a distinct modification. Through a local act of the General Assembly, affected voters of Cumberland County are empowered to exercise a veto over any annexation proposal which would otherwise be implemented by resort to the provisions of Part Two or Part Three. Chapter 1058

of the Session Laws of 1969 provides that a municipality located in Cumberland County may not annex land pursuant to either Part Two or Part Three if, within 30 days after the publication of the notice of intent has been completed, a petition signed by a majority of the voters residing in the area to be annexed is filed with the municipality's governing body stating that the signers of the petition are opposed to the annexation. In other words, even though a tract of land is suitably developed for annexation, the resident voters may nonetheless block the annexation upon the timely filing of an appropriate petition. For reasons which do not appear in the record and which are not properly the subject of speculation, the City of Fayetteville did not proceed to attempt to annex the property which is the subject matter of the case at bar under the provisions of Part Three. It instead sought to annex the property under the provisions of Part One. In any event, the facts remain the same: there are no natural persons residing in the area involved in this action. The area contains only commercial and industrial enterprises.

Plaintiff concedes that defendant fully complied with the requirements of G.S. § 160A-24. However, plaintiff argues that the statutory provisions under which the City of Fayetteville acted violated plaintiff's constitutional rights to due process of law and the equal protection of the law.

Our consideration of plaintiff's arguments proceeds from the following premise: Annexation by a municipal corporation is a political question which is within the power of the state legislature to regulate. *Hunter v. City of Pittsburgh,* 207 U.S. 161, 52 L. Ed. 151, 28 S. Ct. 40 (1907); *Berry v. Bourne,* 588 F. 2d 422 (4th Cir. 1978); *In re Annexation Ordinance,* 296 N.C. 1, 249 S.E. 2d 698 (1978); *see also Garren v. City of Winston-Salem,* 463 F. 2d 54 (4th Cir.), *cert. denied,* 409 U.S. 1039 (1972). Speaking for the court in *Hunter v. City of Pittsburgh supra,* Mr. Justice Moody observed:

Municipal corporations are political subdivisions of the State, created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them. * * * The number, nature and duration of the powers conferred upon these corporations and the terri-

tory over which they shall be exercised rests in the absolute discretion of the State. Neither their charters, nor any law conferring governmental powers, or vesting in them property to be used for governmental purposes, or authorizing them to hold or manage such property, or exempting them from taxation upon it, constitutes a contract with the State within the meaning of the Federal Constitution. The State, therefore, at its pleasure may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the State is supreme, and its legislative body, conforming its action to the State constitution, may do as it will, unrestrained by any provision of the Constitution of the United States. Although the inhabitants and property owners may by such changes suffer inconvenience, and their property may be lessened in value by the burden of increased taxation, or for any other reason, they have no right by contract or otherwise in the unaltered or continued existence of the corporation or its powers * * * .

207 U.S. at 178-179; 52 L. Ed. at 159; 28 S. Ct. at 46-47. Relying upon the holding and rationale of *Hunter,* a number of courts have rejected attacks on state annexation procedures which have rested on due process or equal protection grounds. *Berry v. Bourne, supra; Deane Hill Country Club, Inc. v. City of Knoxville,* 379 F. 2d 321 (6th Cir.), *cert. denied,* 389 U.S. 975 (1967); *Murphy v. City of Kansas City,* 347 F. Supp. 837 (W.D. Mo. 1972); *Doyle v. Municipal Comm'n of State of Minnesota,* 340 F. Supp. 841 (D. Minn.), *aff'd,* 468 F. 2d 620 (8th Cir. 1972); *Adams v. City of Colorado Springs,* 308 F. Supp. 1397 (D. Colo.), *aff'd,* 399 U.S. 901 (1970); *Detroit Edison Co. v. East China Township School Dist.* No. 3, 247 F. Supp. 296 (E.D. Mich. 1965), *aff'd,* 378 F. 2d 225 (6th Cir.), *cert. denied,* 389 U.S. 932 (1967). The sole exception to this pattern of decision making is confined to challenges which rest upon instances of alleged racial discrimination. *Gomillion v. Lightfoot,* 364 U.S. 339, 5 L. Ed. 2d 110, 81 S. Ct. 125 (1960).

---

Texfi Industries v. City of Fayetteville

---

Inasmuch as racial discrimination is not involved in this action, that exception has no application.

[1] Plaintiff argues that the notice requirements of G.S. § 160A-24 deny its right to due process of law under the fourteenth amendment to the United States Constitution. We disagree.

When a municipality wishes to annex contiguous territory pursuant to the provisions of G.S. § 160A-24, it must give public notice by publication once a week for four consecutive weeks in a newspaper in the county with a general circulation in the municipality. If there is no such paper, notice may be given by posting notice in five or more places within the municipality. In either case, the notice must fix the date, hour, and place of the public hearing which must be held with regard to the proposed annexation. The notice must also describe by metes and bounds the property that is to be annexed. The notice which defendant placed in *The Fayetteville Observer* complied in all respects with the mandate of the statute. The notice was also adequate to safeguard plaintiff's right to due process of law. The guarantee of due process is satisfied when notice is given which is reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action. *Cf., Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 315, 94 L. Ed. 865, 874, 70 S. Ct. 652, 657 (1950) (" . . . when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing . . . might reasonably adopt to accomplish it.") *see generally* 2 E. McQuillin, The Law of Municipal Corporations § 7.35 (3d ed. 1979). The notice which defendant published in *The Fayetteville Observer* met this standard. The notice described by metes and bounds the area that was proposed for annexation. The date, hour, and place of a public hearing at which affected persons could voice their opinions were stated prominently. On the facts of this case, a newspaper was a reasonable method of disseminating notice.

Plaintiff argues that the City of Fayetteville ought to have been required to mail notice of the pendency of the annexation proposal to each property owner in the affected area. This contention is untenable. If the means of giving notice which has

been mandated by the legislature is constitutionally adequate, it is not within the province of the judiciary to substitute its judgment for that of the General Assembly. Furthermore, even if it were to be required that each property owner be mailed individual notice of the pendency of the proposed annexation, plaintiff would still not be entitled to receive such an advisory because it owns no real property in the area.

[3] Plaintiff further contends that G.S. § 160A-25 operates to deny to it the equal protection of the laws. This contention is without merit.

G.S. §§ 160A-25 provides:

> If, at the meeting held for such purpose, a petition is filed and signed by at least fifteen percent (15%) of the qualified voters resident in the area proposed to be annexed requesting a referendum on the question, the governing body shall, before passing said ordinance, annexing the territory, submit the question as to whether said territory shall be annexed to a vote of the qualified voters of the area proposed to be annexed, and the governing body may or may not cause the question to be submitted to the residents of the municipality voting separately. The governing body may, without receipt of a petition, call for a referendum on the question: Provided, however, the governing body of the municipality shall be required to call for a referendum within the municipality if a petition is filed and signed by at least fifteen percent (15%) of the qualified voters residing in the municipality, who actively participated in the last gubernatorial election.

Traditionally, courts employ a two-tiered scheme of analysis when an equal protection claim is made. *See generally* J. Nowak, R. Rotunda & J. Young, Handbook on Constitutional Law 522-527 (1978); L. Tribe, American Constitutional Law §§ 16-2, 16-6 (1978); *compare Craig v. Boren*, 429 U.S. 190, 210, 50 L. Ed. 2d 397, 415, 97 S. Ct. 451, 463 (1976) (Powell, J., concurring) *but see San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 70, 36 L. Ed. 2d 16, 64, 93 S. Ct. 1278, 1315 (1873) (Marshall, J., dissenting).

**[2]** When a governmental act classifies persons in terms of their ability to exercise a fundamental right, *e.g.*, *Kramer v. Union Free School District No. 15*, 395 U.S. 621, 23 L. Ed. 2d 583, 89 S. Ct. 1886 (1969); *Shapiro v. Thompson*, 394 U.S. 618, 22 L. Ed. 2d 600, 89 S. Ct. 1322 (1969), or when a governmental classification distinguishes between persons in terms of any right, upon some "suspect" basis, *e.g.; Bolling v. Sharpe*, 347 U.S. 497, 98 L. Ed. 884, 74 S. Ct. 693 (1954), the upper tier of equal protection analysis is employed. Calling for "strict scrutiny", this standard requires the government to demonstrate that the classification is necessary to promote a compelling governmental interest. *E.g.*, *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 39 L. Ed. 2d 306, 94 S. Ct. 1076 (1974).

When an equal protection claim does not involve a "suspect class" or a fundamental right, the lower tier of equal protection analysis is employed. *E.g.*, *Vance v. Bradley*, 440 U.S. 93, 59 L. Ed. 2d 171, 99 S. Ct. 939 (1979). This mode of analysis merely requires that distinctions which are drawn by a challenged statute or action bear some rational relationship to a conceivable legitimate governmental interest. *E.g.*, *New Orleans v. Dukes*, 427 U.S. 297, 49 L. Ed. 2d 511, 96 S. Ct. 2513 (1976); *Hagans v. Lavine*, 415 U.S. 528, 39 L. Ed. 2d 577, 94 S. Ct. 1372 (1974).

For strict scrutiny to be properly applied in evaluating an equal protection claim, it is necessary that there be a preliminary finding that there is a suspect classification or an infringement of a fundamental right. It has been held that a class is deemed "suspect" when it is saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command particular consideration from the judiciary. *E.g.*, *San Antonio Independent School District v. Rodriguez, supra; compare Frontiero v. Richardson*, 411 U.S. 677, 36 L. Ed. 2d 583, 93 S. Ct. 1764 (1973); *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 31 L. Ed. 2d 768, 92 S. Ct. 1400 (1972). The underlying rationale of the theory of suspect classification is that where legislation or governmental action affects discrete and insular minorities, the presumption of constitutionality fades because the traditional political processes may have broken down. *Johnson v.*

*Robison,* 415 U.S. 361, 39 L. Ed. 2d 389, 94 S. Ct. 1160 (1974). In the present case, we are not confronted with a suspect classification. Though the plaintiff is a corporation, we do not find that the challenged statute operates to create or implement a suspect classification. We are unable to conclude that corporations have been saddled with such disabilities, or subjected to such purposeful unequal treatment, or relegated to such a position of political powerlessness as to make it appropriate to make such fictitious entities members of a suspect class. Corporations do not constitute a discrete and insular minority.

Nor do we find that plaintiff has been denied the exercise of a fundamental right. While the right to vote has been identified as a fundamental right, *e.g., Hill v. Stone,* 421 U.S. 289, 44 L. Ed. 2d 172, 95 S. Ct. 1637 (1975); *Dunn v. Blumstein,* 405 U.S. 330, 31 L. Ed. 2d 274, 92 S. Ct. 995 (1972); *Williams v. Rhodes,* 393 U.S. 23, 21 L. Ed. 2d 24, 89 S. Ct. 5 (1968), our inquiry cannot stop with that acknowledgement. The right to vote is not self-executing but requires consideration of the facts and circumstances behind the challenged law, the interest which the state claims to be protecting, and the interest of those who are disadvantaged by the classification. *Storer v. Brown,* 415 U.S. 724, 39 L. Ed. 2d 714, 94 S. Ct. 1274 (1974). That plaintiff is a corporation, an artificial being created for the management and creation of capital, does not, by itself, resolve the issue before this court. It is well established that while corporations are entitled to claim for themselves the protection of a number of constitutional guarantees, *e.g., G.M. Leasing Corp. v. United States,* 429 U.S. 338, 50 L. Ed. 2d 530, 97 S. Ct. 619 (1977); *New York Times Co. v. United States,* 403 U.S. 713, 29 L. Ed. 2d 822, 91 S. Ct. 2140 (1971); *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964), corporate identity has been determinative in denying corporations certain constitutional rights. *California Bankers Association v. Shultz,* 416 U.S. 21, 39 L. Ed. 2d 812, 94 S. Ct. 1494 (1974); *United States v. Morton Salt Co.,* 338 U.S. 632, 94 L. Ed. 401, 70 S. Ct. 357 (1950); *Wilson v. United States,* 221 U.S. 361, 55 L. Ed. 771, 31 S. Ct. 538 (1911). A purely personal guarantee, such as the privilege against compulsory self-incrimination, is unavailable to corporations and other organizations because the historic function of the guarantee has been limited to the protection of the individual. *United States v.*

*White*, 322 U.S. 694, 88 L. Ed. 1542, 64 S. Ct. 1248 (1944). Whether a particular guarantee is purely personal or is unavailable to corporations for some other reason depends upon the nature, history, and purpose of the particular constitutional provision which is being asserted by the organization. *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 55 L. Ed. 2d 707, 98 S. Ct. 1407 (1978).

[3] We hold that plaintiff has no fundamental right to vote in an annexation referendum. The history, policy, and purposes of the right to vote all militate against plaintiff's position. The right to vote is the right to participate in the decision-making process of government. *Reynolds v. Sims*, 377 U.S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362 (1964); *see State ex rel. Quinn v. Lattimore*, 120 N.C. 426, 26 S.E. 638 (1897); *see also* 1 A. Howard, Commentaries on the Constitution of Virginia 86-90 (1974). The right to vote is at the foundation of a constitutional republic. Corporations are artificial entities which are designed for the purpose of managing economic resources. The very nature of a corporation prevents it from sharing an identity with the broader humane, economic, ideological, and political concerns of the human body politic. Aside from being theoretically inconsistent with the basis of our republican form of government, plaintiff's argument fails to confront the practical difficulties inherent in its argument. With the development of modern corporate law and the parallel expansion of the corporate sector of the economy, it is customary for a single corporation to be diversified, consisting of many affiliates and subsidiaries. The Court of Appeals was correct in observing that corporations could become political hydra, which, unlike natural persons, could multiply their voting power by merely creating additional subsidiaries. A state may not dilute the strength of a person's vote to give weight to other interests. *Evans v. Cornman*, 398 U.S. 419, 26 L. Ed. 2d 370, 90 S. Ct. 1752 (1970).

Since it is inappropriate to apply the test of strict-scrutiny in resolving plaintiff's claim, we must now consider whether, under the test of rationality, plaintiff was denied the equal protection of the laws. We hold that G.S. § 160A-25 bears a rational relationship to a conceivable legitimate governmental purpose. It is the responsibility of government to insure the

integrity of the franchise. The integrity of the right to vote is incompatible with the practical difficulties of plaintiff's argument. Not only do corporations have many autonomous components, the modern corporation represents a variety of interests and positions within its framework. Unlike a natural person, a corporation could not speak with a single voice and resolve without causing competing interests to fall silent. Furthermore, a corporation can be located in a number of jurisdictions. This fact, as well as possibility of a multiplicity of subsidiaries, would tend to show that a corporation could attempt to multiply its power at the ballot box.

For the reasons stated, the decision of the Court of Appeals is

Affirmed.

Justice EXUM dissenting.

Believing that this complaint states a claim on the theory that the City of Fayetteville has exceeded its statutory authority in this annexation proceeding, I respectfully dissent and vote to reverse. Both their legislative history and our municipal annexation statutes themselves demonstrate to my satisfaction that the legislature never intended to authorize towns to annex property by way of the referendum procedure outlined in Part 1, Art. 4A, Chapter 160A, of our General Statutes, when there are no residents in the area who can participate in a referendum. Fayetteville seeks to so utilize Part 1. Great mischief, I fear, can result from the majority's view that it can. In fairness to the majority, plaintiff, apparently overly enamored with its constitutional claims or perhaps for other more strategic reasons, does not really make this argument. Nevertheless a complaint must be sustained against a motion to dismiss if there is any legal theory to support it notwithstanding plaintiff's failure to identify the theory for the Court. *See Snyder v. Freeman*, 300 N.C. 204, 266 S.E. 2d 593 (1980).

Both their history and the annexation statutes themselves demonstrate that the legislature does not intend for our towns to be able to annex property by municipal fiat. A town's power to annex is not absolute. It cannot constitutionally be so. The

annexation statutes were designed to permit towns to plan for their own development by empowering them to extend their boundaries, and perforce their services, to "parts of the urban area which are now or soon will become parts of the densely populated and congested urban core." Municipal Government Study Commission Supplementary Report 6 (26 February 1959). Part 1 of these statutes authorizes annexation by petition and referendum of the "qualified voters" in the subject area. G.S. 160A-25. Parts 2 (towns under 5000 population) and 3 (towns over 5000 population) authorize annexation provided the area is sufficiently urbanized according to rigorous, specific statutory standards. *See* G.S. 160A-33, *et seq.*, and G.S. 160A-45, *et seq.* Indeed both Parts 2 and 3 expressly provide, G.S. 160A-33(2)(3); G.S. 160A-45(2)(3):

> "(2) That municipalities are created to provide the governmental services essential for sound urban development and for the protection of health, safety and welfare *in areas being intensively used for residential, commercial, industrial, institutional and governmental purposes or in areas undergoing such development;*

> (3) That municipal boundaries should be extended, *in accordance with legislative standards applicable throughout the State, to include such areas* and to provide the high quality of governmental services needed therein for the public health, safety and welfare." (Emphasis supplied.)

The power of our towns to annex, therefore, under this statutory scheme is dependent upon and presupposes either (1) the will of the qualified voters in the area or (2) the area itself having become sufficiently urbanized.

I can think of no clearer subversion of our annexation statutes than to permit towns to annex under the referendum procedure when there are no "qualified voters" in the area to be annexed who can express their will. Such a process mocks the referendum procedure, thwarts the legislative will, and constitutes, in effect, annexation by municipal fiat.

There is, of course, some evidence in this record that the area in question is developed industrially. Fayetteville, however, does not purport to demonstrate that the area meets statutory urbanization standards. It claims it need not do so because it is proceeding by way of referendum. It sees no obstacle in the fact that there are no qualified voters with which to conduct a referendum. According to Fayetteville, it could, if it wished, annex large tracts of vacant, unused property under the referendum procedure. It could, in effect, annex at will. I totally reject this position. Our annexation statutes were not intended to permit it. *Lithium Corp. v. Bessemer City,* 261 N.C. 532, 135 S.E. 2d 574 (1964).

Whether Fayetteville could proceed to annex this property under Part 3 by showing that it meets statutory urbanization standards is a question not presented to us. Because of a local act, Chapter 1058, 1969 Session Laws, applicable to Cumberland County, even this attempt might be thwarted by a petition opposing the annexation "signed by a majority of the registered voters residing in the area to be annexed." This fact should not preclude our holding here that Fayetteville cannot proceed by way of referendum.

The referendum procedure requires that if fifteen percent of the qualified voters request it, the question of annexation shall be submitted "to a vote of the qualified voters of the area proposed to be annexed." G.S. 160A-25. A favorable vote is a prerequisite, a condition precedent to annexation. *Rheinhardt v. Yancey,* 241 N.C. 184, 84 S.E. 2d 655 (1954). Under Part 3, however, the only prerequisite, or condition precedent, to annexation is that the area meet statutory urbanization standards. If it does, annexation can proceed only to be stopped, if at all, by a majority of "registered voters" who so petition within a specified period. It would be far easier for me to hold that this latter procedure is available to Fayetteville notwithstanding the absence of "registered voters" who might oppose it. At least Fayetteville would have met all the conditions precedent to annexation.

It might well be argued and with some force that whether approval of voters is a condition precedent, or opposition of voters fatal to an otherwise statutorily authorized annexation,

voters in Cumberland County, under my position, must reside in any area to be annexed. This question is not now before us.

What is before us is whether a town may use the referendum procedure to annex an area in which there are no voters to decide the question. I remain convinced that the answer to this question should be no. I cannot, therefore, join in the majority opinion which, in effect, answers it yes.

Justice CARLTON dissenting.

I join in Justice Exum's dissent. It is inconceivable to me that our annexation statutes were intended to permit the kind of action taken by Fayetteville in this case. It is patently preposterous to allow annexation by referendum where there are no "qualified voters" to vote.

I am in further disagreement with the majority opinion. I find no incompatibility between plaintiffs' desire to vote in an annexation proceeding and the responsibility of government to insure the integrity of the franchise to vote. It is true that modern corporations "[represent] a variety of interests and positions within [their] framework." It does not follow, however, that a corporation cannot speak with a single voice. A corporate board can decide how the corporation will cast its vote in an annexation referendum the same way it makes any major policy decision — by a vote of the board of directors.

The majority also seems concerned that corporations can be residents of a number of jurisdictions and that multiple subsidiaries would present the opportunity for multiple voting. It is enough to say that that possibility does not appear in this case. Denial of the right to vote should not be predicated upon the fear of potential abuse. Such abuse can be prevented by appropriate legislation.

In other words, I just do not agree with the apparent majority concern that practical voting procedure problems should preclude our corporate citizens from a voice in annexation elections. I would hold that the denial of their right to vote in annexation referenda is a violation of equal protection of the laws.