IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-127

No. 334PA19-2

Filed 29 October 2021

STATE OF NORTH CAROLINA

v.

TENEDRICK STRUDWICK

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, *State v. Strudwick*, 273 N.C. App. 676 (2020), reversing two orders entered on 8 December 2017 and 19 December 2017 by Judge Yvonne Mims Evans in Mecklenburg County Superior Court. Heard in the Supreme Court on 17 May 2021.

*Joshua H. Stein, Attorney General, by Sonya Calloway-Durham, Special Deputy Attorney General, for the State-appellant.*

*Glenn Gerding, Appellate Defender, by Nicholas C. Woomer-Deters, Assistant Appellate Defender, for defendant-appellee.*

MORGAN, Justice.

¶ 1    The State appeals on the basis of a dissent filed in the Court of Appeals' consideration of defendant's challenge to a trial court order imposing lifetime satellite-based monitoring (SBM) following this Court's remand of the case to the lower appellate court for reconsideration of defendant's claims in light of our decision in *State v. Grady*, 372 N.C. 509 (2019) (*Grady III*). Because the intrusion of lifetime

SBM into the privacy interests of defendant is outweighed by lifetime SBM's promotion of a compelling governmental interest, the trial court was without error in entering an order requiring defendant to participate in SBM for the remainder of his natural life.

## I.    Factual and Procedural Background

On 22 March 2016, the victim in this case, a 64-year-old resident of Charlotte, was walking her dog along a greenway near her home when she noticed defendant was approaching her from the rear. The victim stopped to allow defendant to pass her, but once defendant had done so, defendant came back and began speaking with the victim while petting her dog. Shortly thereafter, defendant said to the victim "I'm sorry about this," grabbed the victim by her arm, and began to drag the victim into a wooded area along the greenway. The victim produced a small taser and managed to discharge the device in an effort to protect herself, but with little effect upon defendant. Defendant then pulled out a sock filled with concrete and began to beat the victim over the head, knocking the taser from her grasp. The victim fell to the ground, and defendant dragged her into the woods and across a creek. Once past the creek, defendant wrapped a sweatshirt around the victim's head and threw her face down on the ground. Defendant proceeded to rape the victim and to commit multiple forms of sexual assault upon her body. Defendant threatened to kill the victim with a gun if she did not do what he said and ordered the victim to remain in place for at

least one minute while defendant made his escape after defendant had concluded his assault. Defendant rummaged through the victim's purse, took her cellular telephone, and then ran out of the woods past a group of bystanders who had gathered around the victim's dog in an attempt to locate its owner. The victim exited the woods a short time later and sought assistance from the bystanders, who contacted the police on her behalf. Utilizing the description of defendant and his last known direction of travel as provided by the victim and the bystanders, law enforcement officers located defendant walking along a busy thoroughfare near the crime scene. A search of defendant's person revealed the victim's cellular telephone and a small amount of marijuana. DNA testing ultimately confirmed that defendant was the perpetrator of the attack upon the victim.

¶ 3     On 28 March 2016, a Mecklenburg County grand jury indicted defendant for, among other charges, the offenses of first-degree kidnapping, robbery with a dangerous weapon, and first-degree forcible rape. Defendant appeared with counsel in Superior Court, Mecklenburg County on 2 August 2017, where he pleaded guilty to the above-referenced offenses and allowed the State to present an uncontested factual basis for a plea agreement which described defendant's attack upon the victim. In consideration of defendant's guilty plea to the three felony offenses, the State agreed to dismiss four counts of first-degree sex offense and the misdemeanor charge of possession of marijuana. The trial court accepted defendant's guilty plea

and sentenced defendant, pursuant to the plea arrangement, to an active term of incarceration of 360 to 516 months. Defendant was also ordered by the trial court to register as a sex offender for life. The prosecution apprised the trial court of the State's intention to seek the imposition of lifetime SBM and to bring defendant back at a later date for a hearing on the State's request.

¶ 4        The State filed a petition to impose lifetime SBM on defendant upon his release from his active sentence. In response, defendant filed a motion to dismiss the State's petition in which he asserted both facial and as-applied challenges under the Fourth Amendment of the United States Constitution and article I, section 20 of the North Carolina Constitution to North Carolina's SBM statutory structure. The matter came on for hearing on 8 December 2017. At the hearing, the State called Probation Officer Shakira Jones as a witness who, while employed as a probation officer for thirteen years with the North Carolina Department of Public Safety (DPS), had spent most of the previous three years specifically supervising sex offenders who were on probation or post-release supervision following the completion of active sentences for sex crimes. In that capacity, Officer Jones also worked as an instructor who provided initial and refresher training sessions to other probation officers who utilized the state's SBM program to monitor sex offenders. Officer Jones explained that when an offender is ordered to complete a term of SBM, a 2.5-by-1.5-inch device weighing 8.5 ounces called an "ET-1" is attached to the offender's body using fiber optic straps,

usually around the offender's ankle. The ET-1 apparatus is charged using a 10-foot cord that allows the offender to move about while the device is charging. Two hours of charging provides 100 hours of ET-1 operation, and Officer Jones testified that even one of her homeless supervisees had no issues with keeping the unit charged. According to Officer Jones, the ET-1 does not restrict travel, work activities, or participation in regular sports. It can be concealed by wearing long pants.

¶ 5 Officer Jones further testified during the State's presentation that the State's monitoring of sex offenders in the SBM program manifests itself in distinct ways. She related that offenders on probation or post-release supervision typically interact with their supervising officers on a regular basis through visits at the offender's home and at the probation office, where the equipment is checked for functionality. However, individuals placed on unsupervised probation are not actively supervised by an officer, but instead are overseen by a central monitoring office in Raleigh. These unsupervised offenders receive a new ET-1 once a year. Other than these compulsory interactions for supervised offenders and yearly check-ins for unsupervised offenders, a person subject to lifetime SBM would have little interaction with the State, unless something goes amiss. For example, Officer Jones explained that in the event that the ET-1 is low on power or if the device loses its signal, an offender's supervising officer or the Raleigh monitoring office can send a message to the ET-1 which will play for the offender until the offender presses a small button on the unit to

acknowledge receipt of the message. If an offender fails to respond to a low battery or lost signal alert, or if an ET-1 remains dormant for six hours, an officer or other state agent will attempt to call the offender to address the issue. In the most extreme cases, such as when an offender attempts to tamper with the ET-1 device, when a sex offender goes to a location where the offender is prohibited from going, or when the offender is unable to independently correct a battery or signal issue, an officer attempts to locate the offender in person and to address any noncompliant or criminal behavior.

¶ 6 Officer Jones elaborated in her testimony for the State on the purpose and operation of the SBM program itself. Officer Jones explained that the purpose of SBM is "to monitor [offenders'] movement and to work closely with other law enforcement agencies so that we can prevent future victims." The SBM program can be used to determine whether an offender was present at a location where a new sexual assault or crime has occurred, to generate potential suspects for a crime based on its location, or to corroborate a victim's allegations against a particular offender. Conversely, an offender in the SBM program would benefit from being eliminated as a suspect if the offender's tracking device established the offender's location to be a place other than the site at issue. Officer Jones related at the hearing that the State also utilizes the SBM program to ensure that registered sex offenders like defendant are actually remaining at their registered homes at night and are staying away from "exclusion

zones"—areas where offenders are not allowed to go—such as schools and daycare facilities. To these ends, the SBM tracker allows the State to access an offender's physical location either in real time or through subsequent review of an offender's movements. The ET-1 only indicates an offender's physical location through the use of cell towers and the Global Positioning System (GPS) and provides no information about an offender's activity at a particular location. Law enforcement officers access an offender's location by interacting with a system operated by the state's SBM vendor BI Incorporated, which displays an offender's location on a map using GPS. Officer Jones testified that offenders on probation and post-release supervision have their locations and data checked at least three times a week by their respective supervising officers according to DPS policy, but could not testify concerning the practices of the Raleigh center in monitoring individuals who had completed their terms of judicially ordered state supervision. Only BI Incorporated and DPS personnel have access to an offender's location information in simultaneous time. While law enforcement officers may contact DPS to obtain historic information about an offender's location in the performance of their duties, all other parties must obtain a court order to be able to access information stored in BI Incorporated's system.

¶ 7 Officer Jones also administered a Static-99 test to defendant, which is an evaluative tool utilized to assess certain information about an offender and the offender's criminal activity in order to determine the offender's risk of committing

another sex offense. The Static-99 accounts for, *inter alia*, whether an offender has ever lived with a romantic partner for more than two years, whether the offender knew or was related to the offender's victim, and at what age a particular offender will be released from prison—all of which are factors deemed relevant to a person's propensity to reoffend. While defendant would have scored a total of four points on the Static-99 if the assessment had failed to take into account the age of defendant upon defendant's release from incarceration—an amount which indicates an above-average risk for reoffending—Officer Jones subtracted one point from the Static-99 composite score since defendant's age would fall within the 40-to-59.9-years-old range upon his release after serving his sentence. The Static-99 therefore reflected a consideration of the lengthy duration of defendant's prison sentence and the corresponding advanced age at which defendant would be released in tallying a total of three points for defendant on the Static-99, ultimately concluding that defendant would have an average risk of reoffending through the commission of another sex offense upon his release from prison in 30 to 43 years.

¶ 8        After Officer Jones concluded her testimony, defendant lodged an oral motion to dismiss. Counsel for the State and for defendant presented arguments as to the reasonableness of lifetime SBM. The trial court denied defendant's motion to dismiss and entertained closing arguments from the parties. Defendant reiterated his argument that "the North Carolina satellite-based monitoring program is facially

unconstitutional under the Fourth Amendment to the United States Constitution and Article I, Section 20 of the North Carolina Constitution" in opposing the State's petition to impose lifetime SBM. The trial court found the imposition of lifetime SBM upon defendant to be reasonable and constitutional under both the federal and state constitutions, explaining:

> THE COURT: . . . the Court finds that it is constitutional, and I find also that such a requirement is reasonable, and so I am going to abide by the statute and require that it be satellite-based monitoring for his lifetime.
>
> Now, having said that, the law changes all the time, and at some point in the next 30 years, it may change again, and he may [sic] eligible to approach the Court and request a different outcome.

The trial court also declined to dismiss the State's petition based upon grounds of double jeopardy, due process, and cruel and unusual punishment.

¶ 9 The trial court filed a form order imposing lifetime SBM on 8 December 2017 pursuant to N.C.G.S. § 14-208.40A(c) (2017) based upon its determination of the existence of the statutory factor as defined in N.C.G.S. § 14-208.6(1a) (2017) that defendant committed an aggravated offense. On 19 December 2017, the trial court filed a more detailed order containing 27 findings of fact and 11 conclusions of law. The trial court made the following findings of fact relevant to this appeal:

> 7. . . . The monitor consists of a middle unit with two adjustable straps. The middle unit is smaller than the palm of Officer Jones' hand. The monitor as worn by participants, with straps and battery, weighs 8.5 ounces.

Participants typically wear the monitor on their ankle, but some choose to wear it on their wrist. If worn on the ankle, the device cannot be seen when the participant is wearing long pants. The State introduced photographs of the monitor being worn on a participant's ankle. The photographs illustrate that the monitor is a small, relatively unobtrusive device.

8. The SBM system used by the State continuously monitors a participant's location using GPS. If a participant is traveling in a vehicle, the system monitors his speed of travel. The system does not collect any additional information, and it does not collect any information about what a participant is doing at a particular location.

9. The information collected by the system is stored on servers of the State's vendor, BI. The information is not publicly available. Probation officers who supervise SBM participants have access to and monitor the information online.

10. Probation officers who supervise SBM participants are required to review the information three times per week. Some choose to review it daily. They review the information to ensure the participant spends nights at his registered address.

11. Probation officers also monitor the information when they receive alerts from the system. Alerts are generated when a participant tampers with his monitor or enters an exclusion zone. Exclusion zones can include the victim's home, the victim's workplace, schools, and daycare facilities. These alerts require an immediate response from the officer for safety purposes.

12. Alerts are also generated when the monitor's battery is low, or when the monitor has a mechanical problem. These alerts are sent to the participant as well. This type of alert does not require immediate response from the officer. If the participant does not begin charging the monitor after

receiving a low battery alert, the probation officer can send him a message asking him to do so. Following a mechanical alert, the officer contacts the participant to schedule an appointment to correct the problem. These appointments can take place at the probation office or the participant's home.

13. Participants who are not on supervised probation are monitored by an officer for the Department of Public Safety in Raleigh. If this officer receives an alert that requires immediate response, they contact local probation officers to respond.

14. Probation officers physically check the monitors only during alert responses, regular probation appointments, and an annual appointment in which they provide participants with a new monitor. This annual appointment may occur at the probation office or the participant's home.

15. The monitor has 100 hours of battery life if charged for two hours. Participants charge the monitor by connecting the battery to a wall outlet by a charging cord. The charging cord is ten feet long, and participants are able to move around while charging the monitor.

16. Officer Jones supervises a homeless participant who does not have trouble keeping his monitor charged.

17. Officer Jones supervises two participants who work in construction. Neither of them experiences difficulty working because of the monitor.

18. The monitor is waterproof up to 10 feet.

19. The only participant Officer Jones has ever supervised who experienced issues with sport activities participated in extreme sports that caused physical damage to the monitor itself.

20. The monitor does not restrict working activities, ability to travel, or sports activities other than extreme sports.

21. Probationers who are participants must receive permission to travel out of state, but this permission is routinely granted.

22. Officer Jones supervises a participant who travels out of state for work on a weekly basis.

23. The purpose of SBM is to assist law enforcement in protecting communities and [sic] prevent future sexual assault victims by monitoring the movement of sex offenders.

24. When a sexual assault is reported, location information from the monitor could be used to implicate the participant as a suspect if he was in the area of the sexual assault, or to eliminate him as a suspect if he was not in the area of a sexual assault.

25. Static-99 is an assessment tool that takes into account multiple factors about the defendant's history in order to determine his risk level.

26. Officer Jones administered a Static-99 to defendant.

27. Defendant scored a 3 on the Static-99 assessment, which indicates average risk. . . .

The trial court also made several conclusions of law pertinent to this appeal:

3. Participation in the State's SBM program constitutes a search for purposes of the Fourth Amendment to the United States Constitution. *Grady v. North Carolina*, 135 S. Ct. 1368, 1371 (2017).

4. Registered sex offenders have a slightly diminished expectation of privacy, as they are subject to the regular conditions imposed by the registry. See N.C.G.S. 14 § [sic], Article 27A.

5. Although imposing lifetime SBM results in an intrusion of privacy; [sic] when considering the totality of the

circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable expectations of privacy, lifetime enrollment in the State's SBM program is reasonable in this case.

6. An order directing defendant to enroll in satellite-based monitoring does not constitute a general warrant in violation of Article I, § 20 of the North Carolina Constitution[,] . . .

7. . . . is not a criminal punishment, and does not violate defendant's right to be free from double jeopardy[,] . . .

8. . . . does not violate defendant's right to be free from cruel and unusual punishment[,] . . .

9. . . . does not increase the maximum penalty for a participant's conviction based upon facts not charged in the indictment and not proven beyond a reasonable doubt[,] . . .

10. . . . [and] does not violate the defendant's substantive due process rights[.]

[11.] Notwithstanding the arguments made by counsel for the defendant both in court and in his written motion, the satellite-based monitoring statute is constitutional on its face and as applied to defendant under both the United States Constitution and the North Carolina Constitution.

¶ 10    Defendant perfected an appeal of the trial court's order imposing lifetime SBM to the Court of Appeals, which reversed the trial court's order in a unanimous, unpublished opinion filed on 6 August 2019. *State v. Strudwick* (*Strudwick I*), COA18-794, 2019 WL 3562352 (N.C. Ct. App. Aug. 6, 2019) (unpublished). The lower appellate court cited several of its own opinions in which it had reversed similar trial court orders "for the same reasons as argued by [d]efendant" in the wake of the

Supreme Court of the United States' decision in *Grady v. North Carolina*, 575 U.S. 306 (2015). *Id*. at *1. On 4 September 2019, the State filed a petition for discretionary review in this Court, seeking an opportunity to argue against the "continued and significant expansion" of the State's burden in cases to prove the reasonableness of the imposition of lifetime SBM under the totality of the circumstances. A few weeks earlier, however, this Court had announced its decision in *Grady III*, which was itself issued in response to the Supreme Court of the United States' mandate to this Court that we reconsider the *Grady* defendant's case in light of the Supreme Court of the United States' conclusion that North Carolina's SBM program constituted a warrantless search which required a reasonableness analysis under the Fourth Amendment. Having received the State's petition for discretionary review in such close temporal proximity to our pronouncement in *Grady III*, this Court allowed the State's petition for discretionary review "for the limited purpose of remanding this case to the Court of Appeals for further consideration in light of this Court's decision in [*Grady III*]."

¶ 11    Upon remand, the Court of Appeals issued a second opinion in this matter. The published decision was rendered by a divided lower appellate court on 6 October 2020, with the Court of Appeals again reversing the trial court's SBM order in this case. *State v. Strudwick* (*Strudwick II*), 273 N.C. App. 676 (2020). Relying primarily on *State v. Gordon* (*Gordon II*), 270 N.C. App. 468 (2020), another case in which the

Court of Appeals reversed a trial court's order imposing lifetime SBM, the majority lamented the "impossible burden" placed upon the State in the State's efforts to establish the reasonableness of lifetime SBM in cases where such determinations are required to be made years and sometimes decades before the search will be effected, due to N.C.G.S. § 14-208.40A's requirement that the State seek the imposition of lifetime SBM at the time that a defendant is sentenced. *Strudwick II*, 273 N.C. App. at 681 (quoting *State v. Gordon* (*Gordon I*), 261 N.C. App. 247, 261 (2018)). According to the Court of Appeals majority's invocation of the *Gordon* lineage of cases, establishing the reasonableness of lifetime SBM when an offender had decades left to serve in prison would require the State to prove that the search would remain reasonable despite the inability to know, with any certifiable degree of certainty, the circumstances impacting a defendant's appropriateness for lifetime SBM between defendant's time of sentencing and defendant's time of release from incarceration. *Id.* The majority concluded that "until we receive further guidance from our Supreme Court or new options for addressing the SBM procedure from the General Assembly, under existing law, we are required by law to reverse defendant's SBM order." *Id.* The dissent disagreed with the majority's assignment of dispositive force to the length of time between the moment when the reasonableness determination is made and the moment when the search would be effected, observing that the Court of Appeals

> cannot anticipate nor predict what may or may not occur
> well into the future, and a prediction or hunch alone is not

> a legitimate basis to overturn the trial court's statutorily
> required and lawful imposition of SBM over a defendant
> still in custody or under state supervision on constitutional
> grounds.

*Id*. at 684 (Tyson, J, dissenting). The State filed a notice of appeal from the Court of Appeals decision pursuant to N.C.G.S. § 7A-30(2), based upon the dissenting opinion[1]. Hence, this Court has been presented with an opportunity to provide the "further guidance" beckoned by the lower appellate court regarding the salient considerations which should constitute and resolve the timing of the reasonableness determination.

## II.  Analysis

Our standard of review is derived from defendant's claim that the imposition of lifetime SBM under the General Assembly's duly enacted statutory scheme which governs the program is unconstitutional. "Whether a statute is constitutional is a

---

[1] We recognize that, during the time period between the State's perfection of its appeal and the issuance of this opinion, the General Assembly enacted a major revision of the state's SBM program as it relates to sex offenders by the passage of Session Law 2021-138, § 18. Act of Sep. 2, 2021, S.L. 2021-138, § 18, https://www.ncleg.gov/EnactedLegislation/SessionLaws/PDF/2021-2022/SL2021-138.pdf. However, this new legislation does not take effect until 1 December 2021. *Id*. at § 18(p). Nevertheless, although brief in its ongoing applicability, the SBM program as it existed at the time of defendant's SBM determination by the trial court still provides governing authority for the trial court's orders under review in the case sub judice, and the General Assembly remains empowered to further amend the SBM program up to or after the effective date of the new legislation. This Court is also aware that this case presents us with an issue that remains unaltered under the new enactment: the lawfulness of the gapped time sequence between the point at which the prosecution seeks, and the trial court potentially orders, the imposition of the continuing warrantless search that SBM presents and the point at which the search is actually imposed upon defendant. Thus, "the version of the SBM program in effect on [8 December 2017], the date of defendant's SBM determination, governs the present case." *State v. Hilton*, 2021-NCSC-115, ¶ 3, n. 1.

question of law that this Court reviews de novo. In exercising de novo review, we presume that laws enacted by the General Assembly are constitutional, and we will not declare a law invalid unless we determine that it is unconstitutional beyond a reasonable doubt." *Grady III*, 372 N.C. at 521–22 (quoting first from *State v. Romano*, 369 N.C. 678, 685 (2017), then second from *Cooper v. Berger*, 370 N.C. 392, 413 (2018)) (extraneity omitted). It is the burden of the proponent of a finding of facial unconstitutionality to prove beyond a reasonable doubt that an act of the General Assembly is unconstitutional in every sense. *State v. Bryant,* 359 N.C. 554, 564 (2005).

**A. Timing of Reasonableness Determination**

¶ 13      As an initial matter, the Court of Appeals determined in this case that the State had failed to meet its burden of showing that lifetime SBM constituted a reasonable search in defendant's case because such a demonstration of reasonableness in light of defendant's incarceration over the course of at least thirty years required that

> the State must divine all the possible future events that might occur over the ten or twenty years that the offender sits in prison and then prove that satellite-based monitoring will be reasonable in every one of those alternate future realities. That is an impossible burden and one that the State will never satisfy.

*Strudwick II*, 273 N.C. App. at 681. In employing this premise as a guidepost in its examination of the State's ability to show the reasonableness of the implementation

of SBM in a case such as the present one in which a defendant is subject to the State's oversight for a substantial period prior to the imposition of SBM, the lower appellate court expands its perception that the State cannot possibly satisfy the reasonableness standard under such circumstances to a conclusion that the entirety of the lifetime SBM statutory structure is facially unconstitutional. However, this approach overlooks, undervalues, or otherwise misidentifies the aspect here that the State is *not* tasked with the responsibility to demonstrate the reasonableness of a search at its effectuation in the future for which the State is bound to apply in the present; rather, the State *is* tasked under a legislative enactment presumed to be constitutional with the responsibility to demonstrate the reasonableness of a search at its evaluation in the present for which the State is bound to apply for the future effectuation of a search.

¶ 14 Just as "[f]airness and common sense dictate that an accused must be tried and sentenced under the state of the law as it exists" at the time of his crime, *State v. Stockton*, 1979 WL 208803, *3 (Ohio Ct. App. April, 4 1979) (citing *Dobbert v. Florida*, 432 U.S. 282, 301 (1977)), identical guidance should apply in the circumstance at issue wherein the current state of the law mandates that the prosecution must request a trial court's imposition of lifetime SBM on a duly convicted sex offender at the offender's sentencing hearing if SBM is being sought. Under this Court's enduring principles, the General Assembly's requirement that the

determination of the imposition of lifetime SBM is to be conducted "during the sentencing phase," N.C.G.S. § 14-208.40A (2019), is presumptively constitutional. *Hart v. State*, 368 N.C. 122, 126 (2015). While the State properly faces a challenging hurdle when attempting to overcome the Fourth Amendment's protections against unreasonable searches when the State requests at a defendant's sentencing hearing that a trial court order the imposition of lifetime SBM, nonetheless the challenge is not intensified or heightened concerning the State's necessity to establish the reasonableness of lifetime SBM merely because the State's compliance with the General Assembly's procedural requirements at a defendant's sentencing hearing includes the State's request for the lifetime SBM at the end of the State's oversight of a defendant, which does not happen to end until decades later. In light of these considerations, defendant in the instant case has failed to satisfy his burden to show, as the proponent of a facial constitutional challenge, that the legislative enactment governing lifetime SBM is unconstitutional beyond a reasonable doubt. *Id.*

¶ 15     Defendant's dispute about the timing of the reasonableness determination in light of the timing of the actual effectuation of the SBM search, decades later, as reflected in the dispositive discussion of the issue by the lower appellate court, is largely allayed by the civil nature of the penalty imposed upon him. Our decision here applies to defendant as he is currently assessed, to the law as it is currently applied, and to the search as it is currently adapted. In the event that defendant is

subsequently assessed more favorably such that the search becomes unreasonable because defendant is deemed to no longer constitute the threat to public safety that he has been determined to pose at the present time[2], then he may petition the Post-Release Supervision and Parole Commission for release from the SBM program upon the passage of one year from his release from prison if defendant can show that he has "not received any additional reportable convictions during the period of satellite-based monitoring and [he] has substantially complied with the provisions of" the SBM program, and that he is "not likely to pose a threat to the safety of others." N.C.G.S. § 14-208.43 (2019). However, this statutory relief from the continued imposition of SBM upon defendant, which is readily available to him, is not the sole vehicle through which defendant could be released from the obligation of SBM upon the trial court's determination that the search has become unreasonable.

¶ 16      Rule 60 of the North Carolina Rules of Civil Procedure also affords potential relief to defendant from prospective application of lifetime SBM or other relief from the SBM order, while maintaining deference to the constitutionality of any search effected during the relevant time period. Rule 60 provides, in pertinent part:

> On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final

---

[2] In his brief, defendant provides examples of such developments which may, if they come to fruition, reduce his threat to the public: "positive clinical assessments after years of cognitive and psychological counseling; educational achievement; skill development; an improved prognosis due to advancements in psychiatric medication; as well as any physical disabilities [defendant] may develop far in the future."

judgment, order, or proceeding for the following reasons:

> (5) . . . it is no longer equitable that the judgment should have prospective application; or
>
> (6) Any other reason justifying relief from the operation of the judgment.

The motion shall be made within a reasonable time. . . .

N.C. R. Civ. P. 60(b) (2019). A Rule 60(b) motion "may not be used as a substitute for appeal," and the appellate process, not Rule 60(b), is the proper apparatus for the correction of errors of law committed by a trial court. *Davis v. Davis*, 360 N.C. 518, 523 (2006). Nonetheless, a trial court that has ordered the imposition of a continuing, warrantless search at a time when such a search was reasonable has not committed an error of law if the continuing, warrantless search becomes unreasonable through changes in circumstances pertaining to the nature, character, and subject of the search. While an otherwise reasonable, warrantless Fourth Amendment search may become unreasonable "by virtue of its intolerable intensity and scope," *Terry v. Ohio*, 392 U.S. 1, 18 (1968), or "as a result of its duration or for other reasons," *Segura v. United States*, 468 U.S. 796, 812 (1984), such circumstances do not render impossible, as the Court of Appeals perceived, the ability of the State to show, and the properness of a trial court to find, the present reasonableness of a search to be conducted in the future. This is particularly true in the event that each of the reasonableness factors which are currently germane to the present case remain materially unchanged in the interim. After all, it has been long established by this Court that "[a]n individual

challenging the facial constitutionality of a legislative act must establish that *no* set of circumstances exists under which the act would be valid." *State v. Thompson*, 349 N.C. 483, 491 (1998) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (emphasis added) (extraneity omitted). It is likewise noteworthy that the only circumstance preventing the immediate imposition of lifetime SBM upon defendant is his superseding term of lengthy incarceration which delays the identified efficacy of SBM.

¶ 17 The availability of the application of Rule 60's provisions to a case such as the current one effectively preserves the rights of individuals like defendant who are subject to the imposition of lifetime SBM only after a significant duration of time has passed, while protecting the sanctity of the constitutionality of the statutory structure of the SBM program which has been legislatively created. Over the course of time, in the event that the circumstances of defendant change in such a manner that the intrusion of lifetime SBM upon defendant's privacy is no longer reasonable to promote a legitimate governmental interest, then defendant may petition the trial court to consider, as to the civil order of SBM, that "it is no longer equitable that the judgment should have prospective application," and defendant may move the trial court to have the judgment set aside. N.C. R. Civ. P. 60(b)(5). And ironically, while the lower appellate court opined that the State's inherent inability to "divine all the possible events that might occur over the ten or twenty years that the offender sits in

prison" negatively impacted the State's ability to establish reasonableness, on the other hand such an inability to predict all eventualities with certainty inures to the benefit of defendant, who is not curtailed in his opportunity to show "*any* other reason justifying relief from the operation of the judgment" which may occur or develop during the time period under scrutiny. N.C. R. Civ. P. 60(b)(6) (emphasis added). The trial courts of this state are endowed with "ample power to vacate judgments whenever such action is appropriate to accomplish justice" through the operation of Rule 60(b)(6) and are invited to wield that power in a judicious manner. *Brady v. Town of Chapel Hill*, 277 N.C. 720, 723 (1971) (extraneity omitted).

¶ 18    In sum, we conclude that the combination of the available resources for defendant's potential relief from the continued imposition of lifetime SBM, in the criminal administrative review form of the Post-Release Supervision and Parole Commission and the civil judicial review form of Rule 60 of the North Carolina Rules of Civil Procedure[3], are sufficient substantive and procedural safeguards to protect defendant's constitutional rights against unreasonable searches, while preserving the constitutionality of the General Assembly's SBM statutory structure which requires the establishment of reasonableness at the mandated time of a defendant's

---

[3] While cautiously refraining from the inappropriate rendition of an advisory opinion, we further note that the passage of S.L. 2021-138, § 18(i) presents a potential additional avenue of relief to defendant as "[a]n offender who is enrolled in a satellite-based monitoring [sic] for life." Act of Sep. 2, 2021, S.L. 2021-138, § 18, https://www.ncleg.gov/EnactedLegislation/SessionLaws/PDF/2021-2022/SL2021-138.pdf.

sentencing hearing when the State's request for SBM monitoring must be made for a trial court's consideration.

**B. Reasonableness of Lifetime SBM**

¶ 19 Having addressed the concerns of the Court of Appeals regarding the timing of the entry of the lifetime SBM determination upon defendant, we next consider the implication of Fourth Amendment jurisprudence, and particularly the application of *Grady III*, to the specific facts of defendant's case. In *Grady v. North Carolina*, the Supreme Court of the United States held that, because the state's SBM program operates "by physically intruding on a subject's body, it effects a Fourth Amendment search." 575 U.S. 306, 310 (2015). Due to the lifetime SBM program's coverage by the Fourth Amendment, the high court vacated our dismissal of defendant's appeal in the *Grady* case and remanded the matter to this Court for an analysis of whether "the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations" resulted in the conclusion that the ongoing, warrantless search imposed by the SBM program was reasonable. *Id*. at 310. We fulfilled this directive from our nation's highest tribunal through the issuance of our opinion in *Grady III*, in which we affirmed as modified a Court of Appeals decision reversing a trial court's order which imposed lifetime SBM on the *Grady* defendant based solely upon his status as a recidivist. *Grady III*, 372 N.C. at 545, 550–51. This Court first addressed the intrusion upon

reasonable privacy expectations which is created by the imposition of lifetime SBM. Our approach ultimately employed a three-pronged inquiry into (1) the nature of the *Grady* defendant's privacy interest itself, *id.* at 527, (2) the character of the intrusion effected by the lifetime SBM program, *id.* at 527, 534 (citing *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 652–53, 658 (1995)), and (3) the "nature and purpose of the search" where we "consider[ed] the nature and immediacy of the governmental concern at issue here, and the efficacy of this means for meeting it." *Id.* at 538 (quoting *Vernonia*, 515 U.S. at 652–53) (extraneity omitted).

¶ 20 This Court in *Grady III*, "mindful of our duty . . . to not undertake to pass upon the validity of the statute as it may be applied to factual situations materially different from that before it," *id.* at 549, expressly limited our as-applied determination of unconstitutionality to defendants who fit squarely within the *Grady* defendant's exact status: (1) a criminal defendant (2) not currently under any supervisory relationship with the State (3) who is ordered to submit to lifetime SBM based solely on the fact that the defendant is a recidivist as defined by statute, and (4) who also is not "classified as a sexually violent predator, convicted of an aggravated offense, or . . . convicted of statutory rape or statutory sex offense with a victim under the age of thirteen." *Id.* at 550. As defendant in the case sub judice was ordered to submit to lifetime SBM based upon his conviction for an aggravated offense, the holding of *Grady III* concerning the unconstitutionality of North

Carolina's lifetime SBM scheme as it applies to recidivists, including *Grady III*'s discussion concerning the State's burden of proof as to the effect of lifetime SBM on reducing recidivism, is wholly inapplicable to the instant case. *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) ("It is axiomatic that a statute may be invalid as applied to one state of facts and yet valid as applied to another." (extraneity omitted)). Instead, we are bound to apply the instructions which we enunciated in *Grady III*—and further developed in *Hilton*—in order to determine the reasonableness of the trial court's imposition of lifetime SBM in defendant's case. *See Hilton*, 2021-NCSC-115, ¶ 18 (recognizing that *Grady III's* as-applied holding was limited to the facts of that case, while employing the Fourth Amendment reasonableness analysis utilized in *Grady III* as drawn from the Supreme Court's guidance in *Grady I*).

¶ 21     Starting with the nature of defendant's privacy interest, the State surely gains pervasive access to defendant's person, home, vehicle, and location through the imposition of lifetime SBM that the State would not acquire otherwise if defendant were not subject to lifetime SBM monitoring. In *Grady III*, we noted that the search impinges upon defendant's "right to be secure in his person [and] his expectation of privacy in the whole of his physical movements." 372 N.C. at 531 (extraneity omitted). This conclusion in *Grady III* regarding the nature of defendant's privacy interest once he is subject to lifetime SBM remains intact and must be considered in the case at

bar. However, defendant's expectation of privacy is duly diminished by virtue of his status as a convicted felon generally and as a convicted sex offender specifically. *Hilton*, 2021-NCSC-115, ¶ 30 ("Though an aggravated offender regains some of his privacy interests upon the completion of his post-release supervision term, these interests remain impaired for the remainder of his life due to his status as a convicted aggravated sex offender.").

¶ 22        Secondly, while we noted in *Grady III* that our decision in *State v. Bowditch* "did not address the defendants' expectations of privacy with respect to the physical search of their person or their expectations of privacy in their location and movements," we did sufficiently incorporate in *Bowditch* the invasion of a defendant's home—another bastion zealously guarded under the Fourth Amendment—for purposes of maintaining SBM equipment. *Grady III*, 372 N.C. at 532 (discussing *State v. Bowditch*, 364 N.C. 335 (2010)). In *Bowditch*, this Court recognized that "it is beyond dispute that convicted felons do not enjoy the same measure of constitutional protections, including the expectation of privacy under the Fourth Amendment, as do citizens who have not been convicted of a felony." *Bowditch*, 364 N.C. at 349–50. The *Bowditch* Court cited a plethora of cases which illustrate the principle that the Fourth Amendment expectation of privacy of persons convicted of felonious sex offenses is routinely subject to encroachment by civil regulations and acts of criminal procedure. *Id.* at 350 (citing *Velasquez v. Woods*, 329 F.3d 420 (5th Cir. 2003) (per curiam) for

the constitutional, forced collection of blood samples from felons; citing *Russell v. Gregoire*, 124 F.3d 1079 (9th Cir. 1997), *cert. denied,* 523 U.S. 1007 (1998) for its discussion of sex offender registries; citing *Jones v. Murray*, 962 F.2d 302, 306 (4th Cir. 1992), *cert. denied,* 506 U.S. 977 (1992) for its holding that probationers lose their Fourth Amendment protections against warrantless searches of their home pursuant to established supervision programs; citing *Standley v. Town of Woodfin*, 362 N.C. 328, 329–30 (2008) for its holding that municipalities may constitutionally ban sex offenders from public parks; citing *State v. Bryant*, 359 N.C. 554, 557–70 (2005) for its conclusion that no due process violation occurs when a sex offender is required to register in North Carolina upon moving to the state despite only being informed of his duty to register in his original state). While we further noted in *Grady III* that the cases relied upon by *Bowditch* "either deal exclusively with prisoners and probationers, do not hold that a conviction creates a diminished expectation of privacy, or do not address privacy rights at all," 372 N.C. at 532, it is clear that *Bowditch* establishes that it is constitutionally permissible for the State to treat a sex offender differently than a member of the general population as a result of the offender's felony conviction for a sex offense. *Hilton*, 2021-NCSC-115, ¶ 30. Concomitantly, a sex offender such as defendant possesses a constitutionally permissible reduction in the offender's expectation of privacy in matters such as the imposition of lifetime SBM.

¶ 23            Lastly, regarding the character of the intrusion which defendant challenges, we recognized in *Grady III* that this factor requires us to "contemplate[ ] the degree of and manner in which the search intrudes upon legitimate expectations of privacy." *Grady III*, 372 N.C. at 534 (extraneity omitted). During the sentencing phase of defendant's trial, the uncontroverted evidence presented by the State showed that the search occasioned by SBM reveals only defendant's physical location, and nothing "about what a participant is doing at a particular location." Testimony also indicated that the State is not allowed to utilize the data which it collects through the SBM program for any unauthorized purpose without running afoul of the Fourth Amendment. This Court in *Grady III* expressed our awareness of the "intimate window into an individual's privacies of life" that the state's SBM program provides. *Grady III*, 372 N.C. at 538 (extraneity omitted). The purposes of the SBM program— to assist the State in both preventing and solving crime—are universally recognized as legitimate and compelling. *Maryland v. King*, 569 U.S. 435, 453 (2013) ("The government's interest in preventing crime by arrestees is both legitimate and compelling." (quoting *United States v. Salerno*, 481 U.S. 739, 749 (1987))). In directing our attention to, and in placing such dispositive weight on, this clearly legitimate goal of the SBM program, the State has compellingly highlighted the safeguards which effectively narrow the State's utilization of SBM to a singular permissible scope of the search effected: to track the location of convicted sex offenders in order to promote

the prevention and prosecution of future crimes by those individuals. Any extension of this use of the compiled data would present an impermissible extension of the scope of the authorized search. *Terry*, 392 U.S. at 19 ("The scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible.") (extraneity omitted). The State's burden of establishing the reasonableness of a warrantless search therefore is ongoing because "in determining whether the seizure and search were 'unreasonable' our inquiry is a dual one— whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 19–20.

¶ 24        The trial court found that the ET-1 is a "relatively small, unobtrusive device" that cannot "be seen when the participant is wearing long pants." As defendant has failed to challenge any of the trial court's findings of fact, and as "unchallenged findings of fact are binding on appeal," *Brackett v. Thomas*, 371 N.C. 121, 127 (2018), we are constrained to this description of the instrument. And while we rued in *Grady III* "[t]he lack of judicial discretion in ordering the imposition of SBM on any particular individual and the absence of judicial review of the continued need for SBM," *Grady III*, 372 N.C. at 535, the present case allows us to assuage these lamentations through a combination of the promulgation of *Grady III* itself—which now requires trial courts to determine the reasonableness of the search imposed on a

particular defendant upon that defendant's challenge to the State's efforts to impose SBM—and our previous discussion of Rule 60 which illuminates the availability of post hoc judicial review of the reasonableness of the search in the event that a change in circumstances warrants such a review. The utility of these methods of judicial review, in conjunction with the access to subsequent, periodic review by the Post-Release Supervision and Parole Commission afforded defendant by N.C.G.S. § 14-208.43, is reflected in the General Assembly's aforementioned codification of similar procedures in its reconstruction of the state's SBM scheme after our opinion in *Grady III*. Act of Sep. 2, 2021, S.L. 2021-138, § 18, https://www.ncleg.gov/EnactedLegislation/SessionLaws/PDF/2021-2022/SL2021-138.pdf. The law-making branch of North Carolina has deemed it appropriate to legislatively memorialize the protections afforded by the overlapping substantive, procedural, administrative, and judicial routes discussed herein, which remain available to defendant and others similarly situated—namely, those sex offenders ordered to submit to lifetime SBM—up to the designated effective date of 1 December 2021 for Session Law 2021-138, § 18, when the provisions of the recent legislative enactment are slated to supplant the outgoing SBM program which presently prevails.

¶ 25    Therefore, as we consider the inconvenience to defendant in wearing a small, unobtrusive device pursuant to SBM protocols that only provides the State with his

physical location which the State may use solely for its legitimate governmental interest in preventing and prosecuting future crimes committed by defendant, in conjunction with the added protection of judicial review as to the reasonableness of the search both at its imposition and at such times as circumstances may render the search unreasonable, we conclude that the imposition of lifetime SBM on defendant constitutes a pervasive but tempered intrusion upon his Fourth Amendment interests. *Hilton*, 2021-NCSC-115, ¶ 35 ("SBM's collection of information regarding physical location and movements effects only an incremental intrusion into an aggravated offender's diminished expectation of privacy.").

¶ 26    The governmental interest which the State advances as the purpose served by the imposition of lifetime SBM upon a sex offender is well documented as being both legitimate and compelling. *King*, 569 U.S. at 453. This governmental interest serves to assist law enforcement in preventing and prosecuting future crimes committed by sex offenders. *See Bowditch*, 364 N.C. at 342–43 ("The purpose of this Article is to assist law enforcement agencies' efforts to protect communities. Understandably, section 14–208.5 explicitly refers to registration, but the SBM program is consistent with that section's express goals of compiling and fostering the 'exchange of relevant information' concerning sex offenders.") (extraneity omitted); *see also Grady III*, 372 N.C. at 539 ("Sexual offenses are among the most disturbing and damaging of all crimes, and certainly the public supports the General Assembly's efforts to ensure

that victims, both past and potential, are protected from such harm.") (quoting *Bowditch*, 364 N.C. at 353 (Hudson, J., dissenting)). As we recognized in both *Grady III* and *Hilton*, "the State's interest in solving crimes and facilitating apprehension of suspects so as to protect the public from sex offenders" is both legitimate and supported by the public through acts promulgated by the General Assembly. *Grady III*, 372 N.C. at 538–39; *accord Hilton*, 2021-NCSC-115, ¶¶ 19–23. More broadly, the maintenance of public safety is "a legitimate nonpunitive purpose" of civil regulatory schemes so long as the legislative enactments which provide operative force to the civil regulations bear some potency in addressing the societal ill of crime. *Smith v. Doe*, 538 U.S. 84, 102–03 (2003).

¶ 27     In her testimony before the trial court and unlike the testimony provided by the State's witness in *Grady III*, Officer Jones testified concerning situations in which lifetime SBM would be obviously effective in assisting law enforcement with achieving the constitutionally endorsed purpose of preventing and solving future crimes by sex offenders. As reflected in the trial court's findings of fact, which we are bound to accept as supported by competent evidence in light of their uncontested nature, *Brackett*, 371 N.C. at 127, "when a sexual assault is reported, location information from the monitor could be used to implicate the participant as a suspect if he was in the area of the sexual assault, or to eliminate him as a suspect if he was not in the area of a sexual assault." Law enforcement may also use the fact that a sex

offender is subject to lifetime SBM to ensure that the offender is actually residing at the residence that he is statutorily required to report to the local sheriff, the violation of which is a Class F felony. N.C.G.S. § 14-208.11 (2019). These observations further buttress the reasonableness of lifetime SBM in appropriate cases, including the instant one.

The state's lifetime SBM program promotes a legitimate and compelling governmental interest. When utilized for the stated purpose, the lifetime SBM program is constitutional due to its promotion of the legitimate and compelling governmental interest which outweighs its narrow, tailored intrusion into defendant's expectation of privacy in his person, home, vehicle, and location. Therefore, the search authorized by the trial court's orders in this case is reasonable and permissible under the Fourth Amendment.

## III. Conclusion

Based upon the foregoing factual background, procedural background, and legal analysis, this Court concludes that the implementation of lifetime satellite-based monitoring is constitutionally permissible and is applicable to defendant under the Fourth Amendment as a reasonable, continuing, and warrantless search based upon the specific facts of defendant's case. The conclusion of this analysis renders the trial court's order in this case, which imposed continuous GPS tracking using a small, unobtrusive ankle monitor on defendant for life based upon the specific facts of his

case, constitutionally permissible under the Fourth Amendment as a reasonable, continuing, warrantless search. Therefore, the opinion of the Court of Appeals is reversed, and the trial court's 8 December 2017 and 19 December 2017 orders remain in full force and effect.

REVERSED.

Justice EARLS dissenting.

The Fourth Amendment only functions if courts are willing to enforce it. Unfortunately, today, this Court has once again proven unwilling to give meaning to the protections the Fourth Amendment provides to the people of North Carolina. As it did in *State v. Hilton*, the majority here resuscitates numerous arguments previously rejected by this Court and bends over backwards to save the State from a constitutional problem of its own making. This time, the majority does so in the service of its remarkable conclusion that a court today can assess the reasonableness of a search that will be initiated when (and if) Mr. Strudwick is released from prison decades in the future, a search will be carried out for as long as Mr. Strudwick lives beyond his release. Fortunately, as the majority now recognizes, its decision is of limited practical importance, given that the General Assembly has just "enacted a major revision of the state's SBM program as it relates to sex offenders" which effectively eliminates lifetime SBM in this state. Regardless, I cannot join the majority in its cavalier disregard for the protections afforded to all North Carolinians under the state and federal constitutions.

To justify flouting the precedent we established in *Grady III*, the majority again reaches for the canard that when a defendant is ordered to enroll in lifetime SBM "based upon his conviction for an aggravated offense, the holding of *Grady III* . . . is wholly inapplicable[.]" Once again, I note that the Fourth Amendment we

interpreted in *Grady III* is the same Fourth Amendment we interpreted in *Hilton*, which is the same Fourth Amendment we are called upon to interpret in this case. We articulated legal principles regarding the proper interpretation of the scope of protections afforded by the Fourth Amendment in *Grady III*. We reserved judgment as to how those principles should be applied in a different case on different facts. But it is sophistry to, once again, treat *Grady III* as if it had nothing to say about the constitutionality of ordering a sex offender to enroll in lifetime SBM. The majority's circumlocutions are window dressing for what is, at its core, a declaration that precedents which this majority does not like will not be respected simply because the majority does not like them.

¶ 32    The majority's labored efforts to reconcile *Hilton* with *Grady III* are unconvincing. Invoking *Grady III* and then adopting legal principles we expressly rejected in that case is not respecting precedent.

¶ 33    To pick just one example, the majority duly notes that *Grady III*'s conclusion "regarding the nature of defendant's privacy once he is subject to lifetime SBM remains intact and must be considered in the case at bar." In *Grady III* we stated that "[w]e cannot agree" with the proposition that the "physical restrictions" associated with enrolling in SBM "which require defendant to be tethered to a wall for what amounts to one month out of every year, are 'more inconvenient than intrusive.'" *State v. Grady*, 372 N.C. 509, 536 (2019) (*Grady III*). We held that "being

required to wear an ankle appendage, which emits repeating voice commands when the signal is lost or when the battery is low, and which requires the individual to remain plugged into a wall every day for two hours," and which constantly tracks an individual's real-time location data in perpetuity, is a significant intrusion on the individual's privacy interests and is "distinct in its nature from that attendant upon sex offender registration." *Id.* at 537; *see also id.* at 529 ("SBM does not, as the trial court concluded, 'merely monitor[ ] [defendant's] location'; instead, it 'gives police access to a category of information otherwise unknowable,' by 'provid[ing] an all-encompassing record of the holder's whereabouts,' and 'an intimate window into [defendant's] life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.' " (quoting *Carpenter v. United States*, 138 S. Ct. 2206, 2217–2218 (2018))). Yet the majority decides it is not bound by this reasoning and instead minimizes "the inconvenience to defendant in wearing a small, unobtrusive device pursuant to SBM protocols that only provides the State with his physical location," an intrusion the majority then justifies by emphasizing that a defendant's "expectation of privacy is duly diminished by virtue of his status as a convicted felon generally and as a convicted sex offender specifically."

¶ 34        The myriad ways in which this majority has turned *Grady III* on its head are comprehensively addressed in dissenting opinions in *Hilton* and *Ricks. See generally*

*State v. Hilton,* 2021-NCSC-115, ¶ 43–83 (Earls, J., dissenting); *State v. Ricks*, 2021-NCSC-116, ¶ 12–21 (Hudson, J., dissenting). I will not rehash every instance here. I will only suggest that, once again, the majority refuses to own up to the jurisprudential havoc it wreaks on its way to reaching its desired outcome.

¶ 35 However, I am compelled to address two additional arguments the majority endorses in this case which further compound the errors it committed in *Hilton*. First, the majority transforms the longstanding but always rebuttable presumption that legislation enacted by the General Assembly respects constitutional bounds into an impenetrable fortress shielding this version of the SBM statutes from judicial review. The majority appears to suggest that the State's actions are constitutional because they were undertaken in accordance with "a legislative enactment presumed to be constitutional[.]" But the question before this Court is precisely whether or not the "legislative enactment" the State is acting in accordance with is or is not constitutional. The fact that the SBM statute, like all statutes, is "presumptively constitutional" does not mean that the statute is *actually* constitutional. *See Moore v. Knightdale Bd. of Elections*, 331 N.C. 1, 4 (1992) ("The presumption of constitutionality is not, however, and should not be, conclusive.").

¶ 36 The presumption of constitutionality is, essentially, a substantive canon of interpretation which reminds courts to "not lightly assume that an act of the legislature," the "agent of the people for enacting laws," "violates the will of the people

of North Carolina as expressed by them in their Constitution." *State ex rel. Martin v. Preston*, 325 N.C. 438, 448 (1989). It counsels deference towards legislative enactments, not an abdication of our "duty . . . in proper cases, to declare an act of the Legislature unconstitutional, [an] obligation imposed upon the courts to declare what the law is." *State v. Knight*, 169 N.C. 333, 351–52 (1915). The majority tries to prove the constitutionality of the SBM statute by reference to the fact that the General Assembly chose to enact it, but that ship sailed "nearly sixteen years before *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803)," when this Court recognized "that it is the duty of the judicial branch to interpret the law, including the North Carolina Constitution. *See Bayard v. Singleton*, 1 N.C. (Mart.) 5 (1787)." *Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 2021-NCSC-6, ¶ 14. In its application of the presumption of constitutionality, the majority deals the General Assembly a trump card it can play any time the constitutionality of a legislative enactment is challenged.

¶ 37        The majority's unwillingness to enforce constitutional limitations on the General Assembly's authority is especially inappropriate in this case given the nature of the legislation at issue and the category of individuals the legislation targets. Mandatory lifetime enrollment in the SBM program necessarily implicates an individual's "fundamental right to privacy . . . [in] his home," *State v. Elder*, 368 N.C. 70, 74 (2015), "which is protected by the highest constitutional threshold and thus

may only be breached in specific, narrow circumstances." *State v. Grice*, 367 N.C. 753, 760 (2015). When the State asserts for itself the authority to cross that threshold, and in the process puts in jeopardy a fundamental right that the people of North Carolina have reserved for themselves in their state and federal constitutions, we have an obligation to rigorously scrutinize the challenged enactment. Our obligation cannot be discharged by outsourcing our work to the General Assembly, particularly when the legislation imposes debilities upon a class of individuals who are subject to widespread public opprobrium. *Cf. Texfi Indus., Inc. v. City of Fayetteville*, 301 N.C. 1, 11 (1980) ("[W]here legislation or governmental action affects discrete and insular minorities, the presumption of constitutionality fades because the traditional political processes may have broken down."). The majority's "casual dismissal of Fourth Amendment rights runs contrary to one of this nation's most cherished ideals: the notion of the right to privacy in our own homes and protection against intrusion by the State into our personal effects and property." *State v. Bowditch*, 364 N.C. 335, 365 (2010) (Hudson, J., dissenting).

¶ 38        Second, the majority improperly excuses the State from its burden of proving the reasonableness of the search it seeks to conduct. Under the Fourth Amendment, the burden is on the State to demonstrate that a search is reasonable. *See, e.g.*, *Grady III*, 372 N.C. at 543 ("[T]he State bears the burden of proving the reasonableness of a warrantless search."). When an individual is ordered to enroll in SBM, the State

continues to effectuate a search of that individual within the meaning of the Fourth Amendment unless and until that individual's requirement to enroll in SBM is terminated. Thus, to prove that SBM is constitutional, the State must provide evidence to support its assertion that it is reasonable to initiate the search when the search will be initiated and to carry out the search for as long as the search will be carried out.

¶ 39        Rather than determine whether the State has proven that a search it will not initiate for decades is reasonable—or whether the State has proven that it will be reasonable to continue this search in perpetuity—the majority wishes away the problem. According to the majority, to hold the State to its burden to prove reasonableness under the Fourth Amendment under the current SBM statute is to impose an "impossible burden." In my view, the majority is correct that it is impossible for the State to prove it is reasonable to order Mr. Strudwick to submit to SBM decades from now and remain enrolled for the remainder of his life, after he has completed the terms of a 360 to 516 month period of incarceration ostensibly imposed at least in part to rehabilitate him, and given the likely evolutions in technology that very well could change both the nature and the intrusiveness of the search. Yet that is reason to hold the statute unconstitutional under circumstances in which it requires the State to do the impossible, not to absolve the State of its obligation to meet constitutional requirements.

¶ 40      The crux of the majority's position appears to be that because "the State *is* tasked under a legislative enactment presumed to be constitutional with the responsibility to demonstrate the reasonableness of a search," the State *must* be able to demonstrate that a search is reasonable in all of the circumstances contemplated by the statute. Put another way, the majority appears to be saying that because N.C.G.S. § 14-208.40A (2019) is "presumptively constitutional," and because the State is acting in accordance with this provision when it "requests at a defendant's sentencing hearing that a trial court order the imposition of lifetime SBM," then the State's actions undertaken in accordance with subsection § 14-208.40A are *ipso facto* constitutional. Again, the fact that the State is acting pursuant to a legislative enactment presumed to be constitutional does not immunize that enactment from constitutional challenge. Under the procedure set forth in N.C.G.S. § 14-208.40A, it is impossible for the State to demonstrate that ordering an individual to enroll in lifetime SBM to begin after a period of incarceration that will last decades, because the State "is hampered by a lack of knowledge concerning the unknown future circumstances relevant to that analysis." *State v. Strudwick*, 273 N.C. App. 676, 680 (2020) (quoting *State v. Gordon*, 270 N.C. App. 468, 475 (2020), *review allowed, writ allowed*, 853 S.E.2d 148 (N.C. 2021)). Our obligation under these circumstances is to enforce the Fourth Amendment. Any remedy lies with the legislature, who possesses the indisputable authority to amend a statute to bring it into compliance with the

constitutions of North Carolina and the United States. *See id.* at 681 ("Our General Assembly could remedy this 'impossible burden' imposed upon the State by amending the relevant statutes . . . ."). Moreover, that is precisely what the legislature has attempted in enacting Session Law 2021-138, § 18. The Court of Appeals recognized that it lacked the authority to suspend the constitution to salvage a statute which compelled the State to violate an individual's fundamental constitutional rights. We should not shirk our obligation to do the same.

¶ 41 The majority's other attempts to rescue the order requiring Mr. Strudwick to enroll in lifetime SBM are similarly unavailing. Once again ignoring a legal principle we established in *Grady III* that it now finds inconvenient, the majority asserts that lifetime SBM is not really lifetime SBM because "Rule 60 of the North Carolina Rules of Civil Procedure also affords potential relief to defendant from prospective application of lifetime SBM or other relief from the SBM order, while maintaining deference to the constitutionality of any search effected during the relevant time period." If it is the duration of the search contemplated that renders an SBM order unconstitutional, then the solution is to limit the duration of the search, which the legislature did when it functionally ended lifetime SBM. *See* Session Law 2021-138, § 18.(d) (providing that an offender eligible for SBM pursuant to N.C.G.S. § 14-208.40(a)(1) shall be ordered to enroll in SBM for a maximum period of ten years). The solution is not to endorse an open-ended search on the promise that someday,

some other court might step in to relieve an individual of an unconstitutional order.

¶ 42          Mr. Strudwick pleaded guilty to committing an egregious crime. He will spend 360 to 516 months in prison as a consequence. No one disputes that the State can take reasonable measures to mitigate the risk that Mr. Strudwick will commit another crime when and if he is released from prison. Where I diverge from the majority is in its willingness to condone the State's failure to adhere to constitutional limits. In its rush to ensure that the State can claim the constitutional authority to order Mr. Strudwick to enroll in SBM after he completes the terms of his sentence, for the rest of his life, regardless of how Mr. Strudwick or monitoring technologies change over the next thirty to forty-three years, and notwithstanding a recent revision to the SBM statute which will reduce his period of enrollment to ten years and provides him with significantly enhanced procedural protections, the majority once again treats the Fourth Amendment as a dead letter. Therefore, I respectfully dissent.

Justices HUDSON and ERVIN join in this dissenting opinion.